## UNITED STATES v. YAFFE.
### Civ. No. 3200.

United States District Court
E. D. Oklahoma.

June 29, 1953.

Edwin Langley, U. S. Atty., Muskogee, Okl., for plaintiff.

Cleon A. Summers, Muskogee, Okl., for defendant.

WALLACE, District Judge.

The plaintiff, the United States of America, brings this action against the defendant, Joseph A. Yaffe, doing business as Yaffe Iron & Metal Company, charging the defendant with selling scrap battery lead groups in violation of the maximum prices established by General Ceiling Price Regulations.[1]

The Government contends that during the "base period"[2] the defendant sold battery groups, which assayed 72% metallic lead, to the Eagle-Picher Company of Texas at a price of $0.1074 per pound, whereas, subsequent to the "base period" the defendant sold to said company the same type of battery groups at between $0.11 and $0.1225 per pound, thus realizing a higher price for the scrap battery lead than that received during the base period. The Government makes a similar allegation in regard to certain sales made by the defendant to the National Lead Company of St. Louis.

The scrap battery lead groups in view contain about 72% metallic lead. However, once the lead is refined it sells for exactly the same price as new lead. The defendant insists inasmuch as he as seller must deliver these battery groups to a refinery, which entails paying the freight, and must pay the smelter for refining or purifying the battery groups into pure lead, that any increase in the "settlement proceeds" re-

1. Defense Production Act of 1950, as amended, Public Law 774, 81st Congress, 64 Stat. 798, Public Law 96, 82nd Congress, 50 U.S.C.A.Appendix, § 2061 et seq. See in particular Executive Order 10161, 15 F.R. 6105, 50 U.S.C.A.Appendix, § 2071 note; Economic Stabilization Agency General Order No. 2, 16 F.R. 738; General Ceiling Price Regulation, 16 F.R. 808; and Ceiling Price Regulation 53, 16 F.R. 6381.

2. Section 1 of General Ceiling Price Regulation reads: "What this regulation does. The purpose of this regulation is to establish ceiling prices for all commodities and services (except those specifically exempt) upon the basis of prices in effect during the period from December 19, 1950, to January 25, 1951, inclusive.

This period is referred to as the "base period". (Emphasis supplied.)

Section 3 of General Ceiling Price Regulation provides: "Ceiling prices for all sellers for commodities or services sold in base period. Your ceiling price for sale of a commodity or service is the highest price at which you delivered it during the base period to a purchaser of the same class. If you did not deliver the commodity or service during the base period, your ceiling price is the highest price at which you offered it for base period delivery to a purchaser of the same class. The offer must have been made in writing and communicated to a substantial number of customers, but in the case of a retailer may have been made by display."

ceived from said purchasers subsequent to the base period is to be attributed to obtaining a more economical smelting service charge rather than to selling "secondhand" lead at a price above the base period selling price.[3]

After carefully considering all the evidence along with the submitted briefs the Court believes that no violation of the maximum ceiling price has been shown and finds the following facts:

(1) At all times material to this controversy Joseph A. Yaffe, doing business under the name of Yaffe Iron and Metal Company, was engaged in the business at Muskogee, Oklahoma, of buying and selling various types of junk, including scrap battery lead plates.

(2) That the ceiling price for pure lead as fixed during the base period prescribed under the government ceiling price regulations was $0.17 per pound.

(3) That at no time during the period referred to in plaintiff's "Complaint" did the price charged by defendant for his lead exceed the ceiling price of $0.17 per pound.

(4) That the sales price of battery plates during the base period was $0.17 per pound based upon metallic content and that the sales price of battery plates subsequent to the base period, during the time alleged in the complaint, was also $0.17 per pound based on metallic content.

(5) That the sales price of the metallic content of battery lead plates at $0.17 per pound by the defendant to the Eagle-Picher Company of Texas and the National Lead Company was one specific transaction and the fixing of the charge for the service of smelting the said plates was a second and separate transaction; and, that the smelting service charge was a specific service purchased by the defendant and was fixed and determined by said purchasing company at an amount over which the defendant had no control.

The Government has forcibly argued that in order to determine the price for "scrap lead", such as sold by the defendant, the amount of the smelting charge together with the general market quotation for pure lead are dealt with as one transaction and determine the price to be paid for scrap lead, inasmuch as it is understood as a custom of the trade that the price per pound for the actual lead contained in any shipment of scrap batteries is always the same as the prevailing market price of primary lead. Thus, the Government insists that the maximum price for "secondhand" lead was set by "settlement proceeds" received by the defendant during the base period, and that the following sections of the General Ceiling Price Regulations were violated:[4]

"Sec. 9. Customary price differentials. Your ceiling prices, when determined, shall reflect your customary price differentials, including discounts, allowances, premiums, and extras, based upon differences in classes or location of purchasers, or in terms and conditions of sale or delivery."

"Sec. 18. Evasion. Any practice which results in obtaining indirectly a higher price than is permitted by this regulation is a violation of this regulation. Such practices include, but are not limited to devices making use of commissions, services, cross sales, transportation arrangements, premiums, discounts, special privileges, tie-in agreements and trade understandings."

Clearly, if the smelting charge was part and parcel of the price received for "secondhand lead" and synonymous with "settlement proceeds" received by defendant in conformity with the pricing method used by

---

3. The defendant insists that the sale of the battery groups was one transaction and that the purchase of the smelting service was a second transaction; and, that for convenience in invoicing, settling and remitting, the smelter deducted the amount due it for the smelting service and the freight advanced from the amount owed the defendant for the sale of the lead and remitted or paid the defendant the difference.

4. Fn. 1, supra.

the trade, doubtless, the defendant is in violation of the ceiling price regulation.

██ However, the Court believes that in substance and in reality the smelting charge was a transaction separate and apart from the price of scrap battery lead and that as such a variation in the smelting charge could not be controlling in determining whether a violation of the ceiling price has taken place.

The ceiling price for pure lead at the time of the sales in question was $0.17 per pound, and at no time did the defendant sell his lead for a price in excess of this $0.17 per pound.

Any arrangement for the smelting of defendant's lead was a separate and distinct transaction from the actual sale of the batteries' metallic content.

Although the "settlement proceeds" received by the defendant varied dependent upon the smelting charge, the relationship between the defendant and the companies in question was not such as to establish a single formula for "second hand" lead and thus mould two transactions into the form of a single transaction.[5] The Court does not believe the regulation was meant to do the thing which the Government has attempted to imply.

Apart from the fact that the Court finds that technically two transactions are in view, rather than one transaction, there are also a number of equities in favor of the defendant.

██ In the first place, although the regulation gives rise to a civil cause of action, such cause of action is *penal* in nature and should be strictly construed.[6] The Government in its own suggested findings of fact and conclusions of law only asks for a single recovery, as distinguished from treble damages where a "wilful" violation is involved. Where admittedly the violation was not wilful and where intelligent men could differ on whether a technical violation of the regulation has taken place, such a doubt should be resolved in favor of the defendant.

██ Although the Courts should zealously enforce regulations such as the one in view where the regulations are pointed and precise, on the other hand the Courts should give the prosecuted every consideration where an ambiguity is inherent in the regulation being enforced.

Secondly, it could be argued that the specific acts of the defendant which are censured by the Government in this litigation technically are acts of a character not intended by Congress to be controlled by the Defense Production Act of 1950, as amended, nor intended to give the Government a cause of action. Section 409(c) of said Act provides:[7]

"If any person selling any material or service violates a regulation or order prescribing a ceiling or ceilings, the person who buys such material or service *for use or consumption other than in the course of trade or business* may \* \* \* bring an action against the seller on account of the overcharge \* \* \* if \* \* \* the buyer either fails to institute an action \* \* \* or is not entitled for any reason to bring the action, the President may institute such action on behalf of the United States \* \* \* or compromise with the seller \* \* \*." (Emphasis supplied.)

██ In any event, the avowed purpose of the Defense Production Act was to re-

---

5. Several executives of the two lead companies involved in the transactions now under scrutiny testified that for years, long before the institution of the Office of Price Stabilization, it has been the custom in the trade to consider the *sale* of lead as one transaction and the *purchase* of smelting service as a second and separate transaction.

6. As mentioned in M. Kraus & Bros., Inc. v. United States, 1945, 327 U.S. 614, 621, 622, 66 S.Ct. 705, 707, 90 L.Ed.

894, which involved a *criminal* prosecution brought by the Government under the 1942 War Emergency Price Control Act, " \* \* \* The dividing line between unlawful evasion and lawful action cannot be left to conjecture. The elements of evasive conduct should be so clearly expressed by the Administrator that the ordinary person can know in advance how to avoid an unlawful course of action."

7. Fn. 1, supra.

tard the inflationary tendency insofar as the ultimate consumer was concerned. It was the direct threat to the purchasing power of said consumer which constituted the danger to our economy. The evidence in the instant case is undisputed that regardless of the smelting charge made by the defendant's purchasing companies, these companies did not pass on the additional cost, if any, to the ultimate consumer or purchaser. The ceiling price for pure lead of $0.17 per pound was never violated.

Not only were the questioned acts of the defendant "in the course of trade or business" thus possibly denying the Government a cause of action under the ceiling price regulations in view, but the said acts had absolutely no tendency to fan the fire of inflation—the very evil Congress had in mind in the legislating of the Act in question. Regardless of the smelting charge, the ultimate purchaser of pure lead never paid more than the ceiling price for lead set by the Office of Price Stabilization.

Occasionally, the moving spirit behind the enactment of a statute, such as the one under consideration, can become eclipsed by a literal interpretation of narrow portions of the letter of the law. The Government seeks just such an application.

Thirdly, although not of itself controlling, the evidence unmistakably indicates that the defendant had no control over the amount of the smelting charge but said charge was solely and exclusively set by the smelting companies. If said companies needed a large quantity of lead and could profitably reduce the smelting charge per pound such was done; alternatively, when the demand for lead was not so great the smelters raised their charge for smelting service.

Where subsequent to the base period the smelters could profitably reduce their smelting charge thus resulting in larger "settlement proceeds" being sent to the defendant but where the ceiling price established by the Government relative to pure lead was never violated, this Court fails to see how under any logic the economy has been damaged or why the Defense Production Act should be called into play.

The defendant is entitled to judgment.

Counsel should submit an appropriate journal entry within ten days.