**UNITED STATES of America, Appellant,**

v.

**Joseph A. YAFFE, doing business as Yaffe Iron & Metal Company, Appellee.**

**No. 4776.**

United States Court of Appeals Tenth Circuit.

Aug. 27, 1954.

Frank D. McSherry, U. S. Atty., Muskogee, Okl. (Harry G. Fender, Asst. U. S. Atty., Muskogee, Okl., was with him on the brief), for appellant.

Cleon A. Summers, Muskogee, Okl., and Sam Goodkin, Fort Smith, Ark.

(Douglas Garrett and Claude Garrett, Muskogee, Okl., were with him on the brief), for appellee.

Before PHILLIPS, Chief Judge, and BRATTON and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

The United States instituted this action against Joseph A. Yaffe, an individual engaged at Muskogee, Oklahoma, in the business of buying and selling various types of junk, including scrap battery lead plates. The action was brought under the Defense Production Act of 1950, as amended, 64 Stat. 798, 65 Stat. 131, 50 U.S.C.A.Appendix, § 2101 et seq., to recover damages for past sales of scrap battery lead plates to Eagle-Picher Company of Texas and National Lead Company at prices in excess of the permitted maximum price, and to enjoin like sales in the future to any purchaser. After observing that the scrap battery lead groups sold to the two named purchasers contained about 72 per cent metallic lead content, and that once such lead was refined it sold on the market for the same price as new lead, the court found that the ceiling price for pure lead as fixed during the base period prescribed under the ceiling price regulations was 17 cents per pound; that the sales price of battery plates during the base period was 17 cents per pound based upon metallic content and that the sales price of battery plates subsequent to the base period was also 17 cents per pound based upon metallic content; that at no time during the period referred to in the complaint did the price charged by the defendant for his lead exceed the ceiling price of 17 cents per pound; that the sales price of the metallic content of the battery lead plates at 17 cents per pound to Eagle-Picher Company of Texas and National Lead Company was one specific transaction and the fixing of the charge for the service of smelting such plates was a second and separate transaction; and that the smelting service charge was fixed and determined by the purchasing companies at an amount over which the defendant had no control, 113 F.Supp. 382. Judgment was entered for the defendant, and the government appealed.

The judgment is challenged upon the ground that the trial court erred in finding and holding that the sales price of the metallic content of the battery lead plates at 17 cents per pound was one specific transaction and the fixing of the charge for the service of smelting the plates was a second and separate transaction; and also upon the further ground that the court erred in finding and holding that the defendant received only 17 cents per pound for the metallic content of the plates both during and after the base period. The defendant assembled large quantities of scrap batteries, and he made sales of battery groups in substantial quantities to Eagle-Picher Company of Texas and National Lead Company. While the merchandise was sold in the form of battery groups, the only constituent element in them having any value was the metallic lead content. That was the element upon which the parties placed value; was the element which the defendant sought to sell and the purchasers sought to buy; and the sales were predicated solely and exclusively upon the extent and value of such content, the remainder of the battery groups being disregarded entirely. Once such lead content was separated and processed, it sold on the market for the same price as new lead. But in order to be readily salable in the channels of trade and commerce, it was necessary that the lead content be processed. The Eagle-Picher Company and the National Lead Company each owned and operated refineries. Instead of processing the lead content himself or having it done by some other person or company and then selling the refined product to such companies, the defendant shipped the battery groups to them with the understanding that they would perform the service of refining and purifying the lead content at a price fixed by them, respectively, and then remit to the defendant on the basis of the processed lead content at a value of 17 cents per pound, less the

refining charge and less any. freight charge which had been paid by the purchasing company. While the fixing and agreeing upon the price to be paid for the battery groups computed on the basis of the refined lead content at 17 cents per pound and the fixing of the charge for the service of smelting the lead were within the framework of one overall transaction, still they were separate and distinct transactions in the sense that neither was a coordinate part of the other. The effect of the transaction was the same in law as though the purchasing companies had remitted in full to the defendant for the metallic content of the lead after being processed on the basis of 17 cents per pound, and the defendant had remitted to the purchasing companies to cover the charge for the service of smelting and for any amount paid for freight. It is a footless play upon words to say that the defendant· was paid for scrap battery groups, not lead. In a case of this kind involving the critical question whether products were sold at prices in excess of the fixed ceiling prices, the substance of the transaction must prevail rather than its mere form at the surface level. While there were instances in which the charge for the smelting service was eliminated, generally the substance of the transactions between the defendant and the two named purchasers, both during the base period and subsequent thereto, was the sale of the scrap battery groups on the basis of 17 cents per pound for the processed lead content thereof, the defendant was paid for such battery groups on that basis, he paid the purchasing companies a sum for smelting service, and he also paid the purchasing companies, in the form of reimbursement, the freight charges.

■ It is urged in effect that as the result of the purchasing companies reducing or eliminating the deduction for the smelting service, the defendant effectively received more for his products than the permitted ceiling price. As the demand for processed lead decreased, it was the tendency of the two purchas-. ing companies to increase the charge for the smelting service; and conversely, as the demand increased, the tendency was to lower the smelting charge or to eliminate it entirely. But that practice was not new and was not confined to the companies which made purchases from the defendant. It was a custom of long standing in the trade generally. In their dealings with the defendant, the charge made by the purchasing companies for the smelting service varied, depending upon the demand for processed lead. And after the base period had passed, the charge was decreased at times and in some instances it was eliminated entirely. But that does not mean that the defendant sold his products at a price which exceeded 17 cents per pound for processed lead. If he had processed the lead himself at a cost less than that charged by the purchasing companies during the base period, and had sold the processed lead at 17 cents per pound, it could not be contended that he sold the product at a price above the permitted ceiling. If he had made arrangements with some other person or company to process the lead at a price less than that which the two purchasing companies deducted during the base period and then had sold the processed lead to the companies for 17 cents per pound, it could not be said that he sold the product at a price in excess of the ceiling price. If subsequent to the base period, he had been able to secure labor for the assembling and shipping of the battery groups for less than he paid during the base period and as the result enjoyed an increased net profit, it could not be said that the sale of the processed lead at 17 cents per pound exceeded the permitted ceiling. Whether a product was sold at a price in excess of the ceiling price is not determined by the amount of net profit accruing to the seller. It is determined by the base price for which the product is sold, regardless of the cost to the seller of obtaining, producing, or processing it. The reducing or eliminating entirely of the charge for the smelting service necessarily increased the margin

of net profit to the defendant, but it did not constitute or effectuate the sale of the processed product at a price above the permitted ceiling.

The judgment is affirmed.