## M. KRAUS & BROS., INC. *v.* UNITED STATES.

No. 198. Argued December 14, 1945.—Decided March 25, 1946.

*Thomas Turner Cooke* argued the cause for petitioner. With him on the brief was *I. Jonas Speciner.*

*W. Marvin Smith* argued the cause for the United States. With him on the brief were *Solicitor General McGrath, Robert S. Erdahl* and *Beatrice Rosenberg.*

MR. JUSTICE MURPHY announced the conclusion and judgment of the Court.

The problem here is whether the petitioner corporation was properly convicted of a crime under the Emergency Price Control Act of 1942.[1]

The petitioner is engaged in the wholesale meat and poultry business in New York City. Poultry is a commodity subject to the provisions of Revised Maximum Price Regulation No. 269,[2] promulgated by the Price Administrator pursuant to § 2 (a) of the Emergency Price Control Act of 1942. Two informations, each containing six counts, were filed against petitioner. Each count alleged that, as an integral part of a specified sale of poultry on a day during the Thanksgiving season in November, 1943, the petitioner "unlawfully, wilfully and knowingly evaded the provisions of said Revised Maximum Price Regulation No. 269, Sec. 1429.5, by demanding, compelling and requiring" the retail buyer to purchase chicken feet or chicken skin at a specified price as a condition of the sale of the poultry. Petitioner's president was named as a co-defendant in the first information and the two informations were consolidated for trial purposes.

The theory of the Government is that the petitioner was guilty of an evasion of the price limitations set forth in this particular regulation if it required the purchase of chicken feet and skin as a necessary condition to obtaining the primary commodity, the poultry. This practice is

---

[1] 56 Stat. 23; 50 U. S. C App. § 901 *et seq.*

[2] 7 Fed. Reg. 10708; reissued with amendments, 8 Fed. Reg. 13813.

commonly known as a "combination sale" or a "tying agreement." It is argued that the petitioner thereby received for the poultry the ceiling price plus the price of the secondary commodities, the chicken parts.

The evidence was undisputed that the poultry was billed by petitioner at ceiling prices fixed by the Price Administrator and that no ceiling prices had been set for chicken feet or chicken skin. It was also undisputed that the demand for poultry during the Thanksgiving season far exceeded the supply and that petitioner voluntarily imposed a rationing system among its customers.

The Government's case rested primarily upon the testimony of seven retail butchers who had purchased poultry and poultry parts from petitioner during the period in question. Only one of them testified explicitly that the sale of poultry to him had been conditioned upon the sale of poultry parts which he did not want and for which there was no consumer demand. His testimony, however, was disbelieved by the jury since it acquitted the petitioner on the two counts involving sales to him. With two exceptions, the other butchers testified either that the feet and skins were loaded on their trucks without previous order or solicitation along with the poultry or that they were billed for both the poultry and the parts without comment. Five of them stated that they sold a small amount of the chicken parts and gave away the balance; one remarked that he could not sell any parts and was forced to dump them. There was no explicit evidence that any of the butchers protested, sought to return the chicken parts or asked to buy the poultry separately. It was reasonable, however, for the jury to find that the sale of poultry was conditioned upon the simultaneous sale of the chicken parts and no contrary claim is made before us.

Several times the petitioner tried to introduce testimony establishing that there was a demand for chicken parts and that they were of value. Petitioner's counsel

stated that "The government has inferred through all of its testimony that chicken skin and chicken feet are so much waste, that they are dumped; that they are not used and they have opened up the door to this type of testimony." But the trial judge ruled that the Government had not put that matter in issue and that the "only thing we are concerned with is whether or not the witnesses who testified purchased chicken feet to meet a demand in their stores." He accordingly refused to admit the proffered testimony from petitioner's witnesses, stating to petitioner's counsel that "I direct you not to put them on the stand . . ."

On cross examination, however, petitioner's president was questioned as to the resale value of chicken skins from the retailer to the general public. He stated that the value was from 25 to 30 cents a pound and that the skin was used to make chicken fat. He also testified that chicken feet had a resale value of from 12 to 16 cents à pound and were used in making soup and gelatin. He further stated that the demand for chicken feet came from retail butchers such as had been on the stand. Petitioner's counsel then recalled one of the retail butchers whose testimony previously had been excluded by the court. He testified that he had bought chicken feet from the petitioner, had "created a demand" for them in his store, and had sold them for from 15 to 20 cents a pound. No further witnesses were called in regard to the retail value of chicken feet and skins.

In submitting the case to the jury, the judge stated that "what these defendants are charged with having done is imposing as a necessary condition to the purchase of turkeys the simultaneous purchase of gizzards, chicken feet or chicken skin, that were utterly useless and valueless to the purchasers. In order to violate the law these defendants must have made more than the fixed price of 37½ cents on the chickens, or the turkey price of 40 to 45

cents. And the testimony about the use of these additional articles sold, the use that can be made of them, will enable you to determine that they were sold at prices— and the prices are on all these slips that are in evidence— entirely out of line with any value that attaches to them, so that it is almost entirely profit to these defendants, and in doing that, by making the purchase of these things at the prices fixed, the defendants both realized a greater consideration than the Office of Price Administration allows for the commodity sold." He also told the jury that the "one question in the case is whether the sale of the chicken skin and feet was a necessary condition to the purchase of the other [poultry]."

The jury acquitted petitioner's president but convicted the petitioner on nine counts. Petitioner was fined $2,500 on each count, a total of $22,500. The conviction was affirmed by the court below, one judge dissenting because of the exclusion of petitioner's proffered testimony. 149 F. 2d 773. In our opinion, however, the conviction must be set aside.

Section 205 (b) of the Emergency Price Control Act of 1942 imposes criminal sanctions on "Any person who willfully violates any provision of section 4 of this Act . . ." Section 4 (a) of the Act in turn provides that "It shall be unlawful . . . for any person to sell or deliver any commodity, . . . in violation of any regulation or order under section 2 . . ." Section 2 (a) authorizes the Price Administrator under prescribed conditions to establish by regulation or order such maximum prices "as in his judgment will be generally fair and equitable and will effectuate the purposes of this Act." Section 2 (g) further states that "Regulations, orders, and requirements under this Act may contain such provisions as the Administrator deems necessary to prevent the circumvention or evasion thereof."

The Price Administrator, pursuant to § 2 (a), issued Revised Maximum Price Regulation No. 269 on Decem-

ber 18, 1942,[3] which regulation was in effect at the time the poultry sales in question were made. Section 1429.5 of this regulation, referred to in the informations, stems from § 2 (g) of the Act. It is entitled "Evasion" and reads as follows: "Price limitations set forth in this Revised Maximum Price Regulation No. 269 shall not be evaded whether by direct or indirect methods, in connection with any offer, solicitation, agreement, sale, delivery, purchase or receipt of, or relating to, the commodities prices of which are herein regulated, alone or in conjunction with any other commodity, or by way of commission, service, transportation, or other charge, or discount, premium, or other privilege or other trade understanding or otherwise."

The manifest purpose of Congress in enacting this statute was to preserve and protect the economic balance of the nation during a period of grave emergency, thereby achieving the prevention of inflation and its consequences enumerated in § 1. *Yakus* v. *United States*, 321 U. S. 414, 423. That aim was implemented by criminal sanctions to be imposed on those who deliberately choose to ignore the national welfare in this respect by selling commodities at prices above established levels. As appears from a combined reading of §§ 205 (b), 4 (a) and 2 (a), criminal liability attaches to any one who willfully sells commodities in violation of a regulation or order of the Price Administrator establishing maximum prices.[4] Cf. *United States* v. *Eaton*, 144 U. S. 677. Recognizing that

---

[3] Reissued with amendments on October 8, 1943. See note 2.

[4] Section 205 (b) is somewhat inartistically drawn. It does not specifically impose criminal liability on those who violate the regulations and orders of the Administrator. But the hurdle of *United States* v. *Eaton*, 144 U. S. 677, is cleared by the reference in § 205 (b) to § 4, which makes it unlawful, among other things, to sell or deliver any commodity in violation of any regulation or order. See *In re Kollock*, 165 U. S. 526; *United States* v. *Grimaud*, 220 U. S. 506; *United States* v. *George*, 228 U. S. 14; *Singer* v. *United States*, 323

sales at above-ceiling prices 'may be accomplished by devious as well as by direct means, Congress in § 2 (g) authorized the Administrator to make provisions against circumvention and evasion of maximum prices. Hence one who willfully sells commodities at prices above the maximum in an evasive manner specified by the Administrator subjects oneself to criminal liability. These statutory warnings are clear and unambiguous. When incorporated with such definite and clear regulations and orders as the Administrator may promulgate, the provisions of the Act leave no doubt as to the conduct that will render one liable to criminal penalties.

This delegation to the Price Administrator of the power to provide in detail against circumvention and evasion, as to which Congress has imposed criminal sanctions, creates a grave responsibility. In a very literal sense the liberties and fortunes of others may depend upon his definitions and specifications regarding evasion. Hence to these provisions must be applied the same strict rule of construction that is applied to statutes defining criminal action. In other words, the Administrator's provisions must be explicit and unambiguous in order to sustain a criminal prosecution; they must adequately inform those who are subject to their terms what conduct will be considered evasive so as to bring the criminal penalties of the Act into operation. See *United States* v. *Wiltberger,* 5 Wheat. 76, 94–96. The dividing line between unlawful evasion and lawful action cannot be left to conjecture. The elements of evasive conduct should be so clearly expressed by the

U. S. 338. Congress has subsequently emphasized this reference even more clearly when, in adding § 204 (e) (1) to the Emergency Price Control Act, it spoke of a criminal proceeding "brought pursuant to section 205 involving alleged violation of any provision of any regulation or order issued under section 2 . . ." § 107 (b), Stabilization Extension Act of 1944, 58 Stat. 639. See also § 6, Act of June 30, 1945, c. 214, 59 Stat. 306, 308, amending § 204 (e) (1) of the Emergency Price Control Act.

Administrator that the ordinary person can know in advance how to avoid an unlawful course of action.

In applying this strict rule of construction to the provisions adopted by the Administrator, courts must take care not to construe so strictly as to defeat the obvious intention of the Administrator. Words used by him to describe evasive action are to be given their natural and plain meaning, supplemented by contemporaneous or long-standing interpretations publicly made by the Administrator. But patent omissions and uncertainties cannot be disregarded when dealing with a criminal prosecution. A prosecutor in framing an indictment, a court in interpreting the Administrator's regulations or a jury in judging guilt cannot supply that which the Administrator failed to do by express word or fair implication. Not even the Administrator's interpretations of his own regulations can cure an omission or add certainty and definiteness to otherwise vague language. The prohibited conduct must, for criminal purposes, be set forth with clarity in the regulations and orders which he is authorized by Congress to promulgate under the Act. Congress has warned the public to look to that source alone to discover what conduct is evasive and hence likely to create criminal liability. *United States* v. *Resnick,* 299 U. S. 207.

In light of these principles we are unable to sustain this conviction of the petitioner based upon § 1429.5 of Revised Maximum Price Regulation No. 269. For purposes of this case we must assume that the Administrator legally could include tying agreements and combination sales involving the sale of valuable secondary commodities at their market value among the prohibited evasion devices. Any problem as to his power so to provide would have to be raised initially in a proceeding before the Emergency Court of Appeals. *Lockerty* v. *Phillips,* 319 U. S. 182; *Yakus* v. *United States,* 321 U. S. 414, 427–431; *Bowles* v. *Seminole Rock Co.,* 325 U. S. 410, 418–419;

*Case* v. *Bowles*, 327 U. S. 92, 98. The only issue bearing upon the regulation which is open in this criminal proceeding is whether the Administrator did in fact clearly and unmistakably prohibit tying agreements of this nature by virtue of the language he used in § 1429.5. That issue we answer in the negative.[5]

Section 1429.5, so far as here pertinent, provides that price limitations shall not be evaded by any method, direct or indirect, whether in connection with any offer or sale of a price-regulated commodity alone "or in conjunction with any other commodity," or by way of any trade understanding "or otherwise." No specific mention is made of tying agreements or combination sales.

It is urged by the Government that this language fits the type of tying agreement allegedly used by petitioner. The contention is that petitioner received for the primary commodity not only the ceiling price but also the price of the secondary commodities which the retailers were required to buy. Conversely, the retailers were compelled to pay not only the ceiling price but also the price of the secondary commodities in order to secure the primary commodity, the poultry. Under this theory it is immaterial whether the secondary products, the chicken parts, had any value to the retailers or whether their price was a reasonable one. Reference is made in this respect to § 302 (b) of the Act, defining price as "the consideration demanded or received in connection with the sale of a commodity." Hence it is concluded that the price limitation on the primary commodity was evaded "in conjunction with any other commodity" within the meaning of § 1429.5. This argument, moreover, represents the consistent interpretation of the Administrator.[6]

---

[5] Cf. *United States* v. *George F. Fish, Inc.*, 154 F. 2d 798.

[6] The Price Administrator has consistently maintained the position that compulsion to purchase a secondary product is an evasion of the maximum prices fixed for the primary product. Thus, in an inter-

But we do not believe that, under the strict rule of construction previously discussed, such an interpretation of § 1429.5 is dictated by its plain language. It prohibits evasions through sales of price-regulated commodities "in conjunction with any other commodity." That clearly and undeniably prohibits evasions through the use of tying agreements where the tied-in commodity is worthless or is sold at an artificial price, thereby hiding an above-ceiling price for the primary commodity. But to say that the language covers more, that it also applies to a case where the secondary product has value and is sold at its ceiling or market price, is to introduce an element of conjecture and to give effect to an unstated judgment of policy.

The language of § 1429.5 is appropriate to and consistent with a desire on the Administrator's part to prohibit only those tying agreements involving tied-in commodities that are worthless or that are sold at artificial prices.

---

pretation issued November 5, 1943, applicable to all maximum price regulations, the Administrator, in discussing violations and evasions, made the following interpretation as to tying agreements:

"(a) *As to freeze regulations:* A purchaser may not be required to buy a combination of commodities if he was not required to do so during the base period, because such an arrangement is a tying agreement which results in the seller receiving a larger consideration for his commodity than he charged during the base period.

"(b) *As to regulations other than base period freeze regulations:* OPA has also consistently held that any arrangement by which a seller conditions the sale of a commodity in any manner upon the purchase by the buyer of any other commodity is a tying agreement, and constitutes a violation.

"*For example,* it is a violation for a seller to compel a purchaser of a load of corn to also purchase a load of alfalfa, even though the total price for the corn, plus the alfalfa, does not exceed the aggregate of the ceiling price for each item, or another example: It is a violation for a seller to compel a purchaser of nylon hose to also purchase a war bond."

O. P. A. Service (Pike & Fischer) vol. I, p. 2: 812.

The Administrator may have thought that other tied-in sales did not constitute a sufficient threat to the price economy of the nation to warrant their outlawry, or that they were such an established trade custom that they should be recognized. But we are told that he had no such thought, that prohibition of all tying agreements is essential to prevent profiteering, and that this blanket prohibition is the only policy consistent with the purposes of the Act. All of this may well be true. But these are administrative judgments with which the courts have no concern in a criminal proceeding. We must look solely to the language actually used in § 1429.5. And when we do we are unable to say that the Administrator has made his position in this respect self-evident from the language used.

The Administrator's failure to express adequately his intentions in § 1429.5 is emphasized by the complete and unmistakable language he has used in other price regulations to prohibit all tying agreements, including those involving the sale of valuable secondary products. Thus he has inserted in the meat regulation a provision prohibiting evasion of price limitations by "offering, selling or delivering beef, veal or any processed product on condition that the purchaser is required to purchase some other commodity." § 1364.406, Revised Maximum Price Regulation No. 169, as amended March 30, 1943, 8 Fed. Reg. 4099. And in the clothing regulation, the Administrator has provided that "No manufacturer shall make a sale of garments which is conditioned directly or indirectly on the purchase of any other commodity or service." § 15, Revised Maximum Price Regulation No. 287, issued June 29, 1943, 8 Fed. Reg. 9126. See also § 1389.555, Maximum Price Regulation No. 330, as amended August 7, 1943, 8 Fed. Reg. 11041.

The very definiteness with which tying agreements of all types were prohibited in regard to many other com-

modities and the absence of any such prohibition in § 1429.5 of Revised Maximum Price Regulation No. 269 might well have led a reasonable man to believe that tying agreements involving the sale of a valuable secondary commodity at its market price were permissible in the poultry business when the transactions in question took place. Certainly the language used by the Administrator did not compel the opposite conclusion. And certainly a criminal conviction ought not to rest upon an interpretation reached by the use of policy judgments rather than by the inexorable command of relevant language.

In view of these considerations we interpret § 1429.5 as prohibiting only those tying agreements involving secondary products that are worthless or that are sold at artificial prices. It follows that the conviction below cannot stand. While the informations can be interpreted as charging a crime under § 1429.5 as we have read it, the trial judge's charge to the jury was clearly erroneous. There was evidence, at first excluded but later admitted, that the chicken parts which the petitioner sold did have value and were sold at their market price. If the jury believed such evidence it was entitled to acquit the petitioner. But the trial judge charged that the "one" question in the case was whether the sale of the chicken parts was a necessary condition to the purchase of the poultry. On the basis of that charge the jury may well have disregarded as irrelevant the evidence of value as to the secondary products and convicted solely on the ground that there was a tie-in sale. Such a charge is thus reversible error.

There were additional statements in the charge to the jury, to be sure, that the petitioner was charged with having compelled, in connection with the purchase of poultry, the simultaneous purchase of chicken parts "that were utterly useless and valueless to the purchasers" and at prices "entirely out of line with any value that attaches

to them." While such statements tended to charge a violation of § 1429.5, as properly interpreted, they were so intertwined with the incorrect charge as to negative their effect. "A conviction ought not to rest on an equivocal direction to the jury on a basic issue." *Bollenbach* v. *United States*, 326 U. S. 607, 613.

The case must therefore be remanded for a new trial, allowing full opportunity for the introduction of evidence as to the value of the chicken parts and charging the jury in accordance with the proper interpretation of § 1429.5.

*It is so ordered.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, concurring.

If a retailer sold meat or any other commodity to a consumer only on condition that he purchase and pay for a wholly worthless article, it would be clear that price ceilings had been violated. For the attribution of value to the worthless article would be nothing more than an evasive method of increasing the ceiling price on the other commodity. I can see no difference where the additional commodity, although it has value, has no value to the purchaser.

But this case is different in both respects or so the jury might find. First, chicken gizzards, chicken skin, or chicken feet are not wholly worthless articles. There is demand for them and they have a value. Second, they were tied-in with sales to retailers who constitute the market for chicken gizzards, chicken skin, and chicken feet. If in fact they had no value on that market, evasion of price ceilings would be established. But since they apparently had some value on the retail market, no violation of price ceilings occurred unless the price charged for them in fact exceeded that market value. That might

be shown either by proof of the fact that the market value was lower or by showing that the quantity forced on the retailers was in excess of the quantity which the market could absorb.

The case should be remanded for a new trial on that basis. For the trial court ruled that the additional articles sold were valueless and that the "one question in the case is whether the sale of the chicken skin and feet was a necessary condition to the purchase of the other." That ruling took from the jury the basic issue in the case.

I think there was evidence that these chicken gizzards, chicken skin, and chicken feet were valueless to some of the retailers and that a conviction would be warranted. But it is not enough that we conclude on the whole record that a defendant is guilty. *Bollenbach* v. *United States,* 326 U. S. 607. The jury under our constitutional system is the tribunal selected for the ascertainment of guilt.

Mr. Justice Rutledge, concurring.

I am in agreement with the result and substantially so with Mr. Justice Murphy's opinion. I do not think that administrative regulations, given by statute the function of defining the substance of criminal conduct, should have broader or more inclusive construction than statutes performing the same function. If the regulations involved here had been enacted specifically by Congress in statutory form, I do not think they could properly be construed to forbid tie-in sales of these commodities *per se.*

As the opinion points out, the regulations, with reference to other commodities, expressly prohibited tie-in sales, regardless of whether the tied-in commodity had value. Persons dealing in those commodities were specifically informed by the regulations, therefore, that such sales would be in violation of the Act. There was no such specific prohibition applicable at the time of the sales in question to sales of poultry. However the general pro-

hibition against evasion contained in § 1429.5 of Revised Maximum Price Regulation No. 269 might be interpreted, if there had been no regulations specifically forbidding tie-in sales of other commodities, in view of their existence and the absence of any similar provision relating to poultry, I do not think it permissible to construe § 1429.5 as covering the same ground. Persons reading the regulations to determine what conduct had been forbidden were entitled in my opinion to conclude that the Administrator, whenever he thought tie-in sales were *per se* evasive or in violation of the Act's policy, had expressly so stated and conversely that where he had not expressly forbidden the practice, it was not to be understood as prohibited by general language applicable to many other types of situation but not specifically to this one. This view, I think, would be required if the regulations had been enacted in statutory form. As regulations they cannot be given broader content.

Accordingly I agree with the conclusion that tie-in sales were not forbidden at the time of these sales, as to poultry. I also agree that the trial court, both in its instructions and in some of its rulings upon the admissibility of evidence, went on a conception of the law inconsistent with this view. I therefore concur in the Court's disposition of the cause.

MR. JUSTICE FRANKFURTER, although agreeing with the opinion of MR. JUSTICE MURPHY, also joins in this opinion.

MR. JUSTICE BLACK, dissenting.

We were at war in 1943. Scarcity of food had become an acute problem throughout the nation. To keep the public from being gouged the Government had set ceiling prices on food items. Congress had made it a crime to sell food above these ceiling prices. When Thanksgiving Day approached there were not enough turkeys to supply

the demand of the many American families who wanted to celebrate in the customary style.

The information filed in the District Court charged that the petitioner "unlawfully, wilfully and knowingly evaded the provisions of . . ." Revised Maximum Price Regulation No. 269, § 1429.5, by compelling and requiring the buyer to purchase chicken feet, chicken skin, or gizzards at a specified price, as a condition of the sale of poultry to them. During peace times the petitioner had ordinarily done a gross business of seven-and-a-half million dollars a year. In 1943, presumably due to the meat shortage incident to the war, the petitioner's gross business was not quite four million dollars. This meat shortage was felt acutely during the Thanksgiving season, when petitioner instead of his usual 100 to 150 cars of turkeys received only one car. When the retail butchers and poultry market proprietors came clamoring for their share of the small supply (which the defendant rationed among them) they found that along with the turkeys which they wanted so badly petitioner gave and charged them for large amounts of chicken feet, skins and gizzards which they had not asked for at all and which for the most part they had never before sold as separate items. While the butchers paid in addition to the ceiling price charged for the turkeys the price charged for the chicken skins and feet, they did so only because they understood that unless they bought these unwanted items they could get no turkeys. Only one of the butchers sold all the chicken skins to his customers. He explained that he operated his store in a poor neighborhood where the food shortage had become so acute that people were willing to buy anything they could get. As to the rest of the butchers, some simply dumped the chicken skins and feet while others, after diligent efforts, sold a few pounds and then gave the rest away either to their customers, or to charitable institutions. Certainly these particular butchers forced to buy

these unwanted items for the first time were not the regular retail outlet for disjointed chicken feet and peeled chicken skins, if there ever was such an outlet on a voluntary basis. It is clear therefore that as a result of petitioner's forcing his customers to buy the feet and skins along with the turkeys, the retailers' cost price of the turkeys was in effect increased beyond the ceiling.

In my opinion petitioner's practice in forcing the butchers to buy unwanted chicken feet in order to get wanted turkeys amounted to a direct violation of the Price Control Act. It certainly was no less a violation of the Administrator's regulation against evasion. In promulgating this regulation the Administrator could not possibly foresee every ingenious scheme or artifice the business mind might contrive to shroud violations of the Price Control Act. The regulation does not specifically describe all manner of evasive device. The term "tying agreement" nowhere appears in it, and a discussion of such agreements is irrelevant. We need not decide whether what petitioner did would have violated every possible hypothetical regulation the Administrator might have promulgated. The regulation here involved prohibits every evasion of the Price Control Act. It thus condemns all actions that are "on the wrong side of the line indicated by the policy if not by the mere letter of the law." *Bullen* v. *Wisconsin,* 240 U. S. 625, 631. What petitioner did here is on the wrong side of both letter and policy. The Court does not deny that there was ample evidence to support the jury's finding that petitioner did what the information charged it with doing. In my opinion that was a crime.

Had butchers been required to buy bags of stones as a condition to buying turkeys, I think it would have been hard to persuade them, or anybody else, that the seller who forced them to do so was not guilty of violating and evading the law. Had people who wanted and needed bacon,

at the time when bacon was almost impossible to purchase, been required to buy hog hoofs and hog skins with each purchase of a pound of bacon, I think the sellers would have violated the law. If the wholesaler can require the retailer to purchase unwanted items the retailer can force the ordinary consumer to do the same thing. A restaurant could then force its customers to purchase used kitchen fats along with their meals. It would be little consolation to a customer forced to do so to learn that soap factories can use these fats and would be willing to purchase them. He would pay the price, and either dump the fat into the nearest ash can or tell the waiter to take the smelly substance away. The result would be increased cost of meals in that restaurant. Thinly disguised subterfuges like the one here adopted should not be sanctioned by courts. Once they are sanctioned, laws enacted by Congress for the public welfare are no longer respected.

When food is scarce and people are hungry it is a violation, both of the letter and spirit of the Price Control laws, to require consumers or retail stores where they make their purchases, to buy things that they neither need nor want as a condition to obtaining articles which they must have. I dissent from the Court's disposition of this case.

Mr. Justice Reed and Mr. Justice Burton join in this opinion.