Joseph SACHS, doing business as Atlantic Liquor Wholesalers, Plaintiff,

v.

**BROWN–FORMAN DISTILLERS CORPORATION, Defendant.**

United States District Court
S. D. New York.

Sept. 12, 1955.

Krause, Hirsch, Levin & Heilpern, New York City, for plaintiff, Sydney Krause, Charles Singer, Bernard Wexler, New York City, of counsel.

White & Case, for defendant, Thomas Kiernan, E. A. Fintel, New York City, of counsel.

WEINFELD, District Judge.

Plaintiff, Joseph Sachs, a licensed liquor wholesaler, sold to the defendant, Brown-Forman Distillers Corporation, a distiller, 1,200 barrels of aged bulk whiskey for $100,259.49. He now seeks to recover three times the sum of $481,642.51 representing the difference between the sales price and $582,000, the claimed market value of the barrels of whiskey. The action is grounded upon an alleged violation by the defendant of the price discrimination provisions of the Robinson-Patman Act.[1] The same transaction is also the subject of a separate cause of action for single damages based upon an alleged violation of the Alcoholic Beverage Control Law of the State of New York which, in substance, makes it unlawful to discriminate directly or indirectly in price between one wholesaler and another in the State of New York.[2]

---

[1]. 15 U.S.C.A. § 13(a).

[2]. McK.Consol.Laws, c. 3-B, Alcoholic Beverage Control Law, § 101-b, subd. 2(a).

At the threshold it is noted that at the time these parties entered into the transactions which give rise to the present suit, the plaintiff had scarce bulk whiskey and the defendant had scarce nationally advertised case goods. Each sold the desired commodity to the other. There is no claim that the price charged to the plaintiff for the case goods was different from that charged by the defendant for the same goods to any of its other wholesale distributors in the State of New York, who were the plaintiff's competitors. What plaintiff does charge, in substance, is that the defendant as a condition of the sale of the case goods to him required that he sell his scarce bulk whiskey below its fair market value and that the difference between the latter figure and the sales price allocated to the number of cases purchased by him represents an increased price per case over that charged to other of defendant's New York distributors and as such is a prohibited price discrimination.

The defendant contends that its purchase of the bulk whiskey was made at the then applicable maximum OPA prices,—the maximum price that plaintiff legally could charge. Other defenses are also advanced.

As against plaintiff's essential claim we consider the facts.

For a number of years prior to April, 1946, the plaintiff was engaged on a modest scale in the wholesale liquor business under the name of Atlantic Liquor Wholesalers. On April 3, 1946 he entered into a formal agreement for the purchase of the entire outstanding capital stock of Capitol Wine & Spirit Corp. (hereinafter called "Capitol"), a large and theretofore successful liquor wholesaler whose federal license had been annulled but which was then operating under successive extensions to permit an orderly liquidation of its inventory. The sale of "Capitol's" stock to plaintiff was made subject to the approval of both the New York State Liquor Authority and the Office of Price Administration. Among Capitol's assets were 4,150 barrels of aged bulk whiskey. Plaintiff in

the negotiations leading to the consummation of the contract was represented by his brother who at one time practiced law and was then the head of two finance companies and generally experienced in legal, business and financial matters.

Plaintiff and his brother, convinced that a combined venture of Atlantic and Capitol required for its successful operation the distribution of nationally advertised brands of whiskey, undertook negotiations to secure such products. The defendant is a distiller of well-known and nationally advertised brands of whiskey, among them "Old Forester" bourbon and "King" blended whiskey. Accordingly plaintiff, even before the requisite approvals had been issued—and indeed even before the formal agreement for the purchase by him of Capitol's stock had been signed—initiated and thereafter conducted negotiations with the defendant to obtain defendant's aforementioned products. These negotiations had progressed so far that on June 20, 1946 a conference was held at the defendant's offices in Louisville, Kentucky between the plaintiff's representatives and the defendant's representatives. Again acting principally for the plaintiff at this session was his brother.

At the June 20th conference an agreement was reached and embodied in a letter from the defendant addressed to Capitol. This agreement provided for the sale by Capitol to the defendant of 1,200 barrels of bulk whiskey at the applicable OPA maximum ceiling prices. Payment for this merchandise was to be made by the defendant against sight draft drawn on it with warehouse receipts attached.

The June 20, 1946 letter further committed the defendant to the delivery to Capitol over a period of two years and six months, beginning July, 1946 and ending December, 1948, of 120,006 cases of defendant's Old Forester and King at the applicable maximum OPA ceiling price to wholesalers during price control, and when no longer subject to government price regulation, at the defendant's lowest f. o. b. price to similar whole-

salers in effect from time to time. Capitol was to have the right to distribute these case goods in the Metropolitan area of New York City and Newburgh, New York. The agreement was stated to enure to the benefit of, and be binding upon, the successors and assigns of the respective parties, provided however that any assignee of Capitol be a duly licensed liquor wholesaler and satisfactory to the defendant.

While formal approvals to the sale of the stock had not been issued at the time of the conference, plaintiff's representatives and Capitol's officers were aware that the respective governmental agencies had indicated consent to the sale and that the certificates of approval would be issued in due course.

On June 27th, just one week after the letter agreement of June 20th was delivered to plaintiff's brother, the plaintiff, following the issuance of the requisite consents, became the sole stockholder of Capitol pursuant to the agreement of April 3, 1946. As of 12:01 a. m. July 1, 1946, pursuant to a plan of voluntary liquidation, all of Capitol's assets were distributed to the plaintiff as its sole stockholder, who thereby became the owner of the 4,150 barrels of bulk whiskey, which included the 1,200 to be sold to the defendant and referred to in the letter of June 20, 1946.

OPA controls expired at midnight on June 30, 1946 [3] and no price control was in effect until July 25, 1946, when the Price Control Extension Act of 1946 became effective.[4] The twenty-five day period between is referred to as the hiatus period. On July 12, 1946 the plaintiff forwarded to the defendant warehouse receipts covering the entire 1,200 barrels of whiskey together with a sight draft at the June 20, 1946 OPA price totalling $100,257.49 which was accepted and paid by the defendant on July 15th —all in accordance with the terms of the June 20th letter.

As already noted, the June 20, 1946 letter was signed by the defendant but not by Capitol. However, on July 12, 1946 when plaintiff forwarded the warehouse receipts for the 1,200 barrels of whiskey together with the sight draft he advised the defendant it was "in accordance with the terms of your letter of agreement * * *" and further, that among Capitol's assets taken over by him was the "contract with your company, which I was very pleased to adopt" and requested the defendant pursuant to its letter of June 20, 1946 "to indicate * * * in writing that you are satisfied with the assignment of the said contract to me * * *". On July 17th the defendant formally consented to the transfer "of our contract with Capitol" to the plaintiff.

The plaintiff's claim in this suit stems from the June 20, 1946 agreement, although he contends that as to him there was no agreement until July 17, 1946 when a novation occurred. The basic claim, already noted, is that the bulk whiskey which was sold for $100,257.49 had a fair market or "true economic" value of $582,000 and that the difference was an overcharge or price discrimination practiced by the defendant in its sale to him of the case goods and a violation of the Robinson-Patman Act, entitling him to recover treble the amount which he claims to be the resultant damage.

In my view of the case, it is unimportant to the decision of the basic question presented whether the contract be deemed to have been made on June 20, 1946 when price controls were in effect or in July, 1946 during the hiatus period. I say this although I am of the view, and so find, that the letter agreement of June 20, 1946, although subject to the defense of the Statute of Frauds, and possibly other defenses, by Capitol, was fully ratified, affirmed and adopted by the plaintiff, as evidenced by various

---

3. Emergency Price Control Act of 1942, 56 Stat. 23 (1942), as amended, Act of June 30, 1945, 59 Stat. 306 (1945).

4. 60 Stat. 664 (1946), 50 U.S.C.A.Appendix, § 901 et seq.

writings and memoranda signed by or on behalf of the plaintiff. This makes it unnecessary to explore the many and conflicting contentions of the parties dealing with the law of contracts and the applicability of the Statute of Frauds.

When we examine the transaction of June 20, 1946 in its setting it becomes crystal clear what the parties were trying to do. At that time it is true that Capitol, not the plaintiff, nominally owned the bulk whiskey. Plaintiff, however, was on the verge of either owning or by stock ownership controlling this whiskey. In fact at the time of the conference the OPA had already informally indicated its consent to the sale of Capitol's stock to the plaintiff and on that very day the New York State Liquor Authority had issued its official approval. Not only were Capitol's stockholders firmly committed by contract to sell out to the plaintiff, but in view of Capitol's past difficulties with the government and the pending loss of its permit it is utterly unrealistic to believe that the defendant in addressing its letter of June 20, 1946 to Capitol ever contemplated making Capitol as the then owner its distributor. The plaintiff, acting through his brother, and the defendant were dealing in anticipation of the plaintiff soon acquiring 100% of Capitol's stock and thereby in effect becoming Capitol.

Though the June 20th letter was in terms addressed to Capitol, as the nominal legal owner of the whiskey, in fact it was plaintiff who was intended to assume it as soon as he was legally in a position to do so. That is why the letter was delivered to plaintiff's brother who later turned it over to the plaintiff. That, too, is why no one of Capitol's expiring management participated in the conference or signed or was asked to sign the agreement on behalf of Capitol. Neither plaintiff nor defendant expected Capitol as then constituted to have anything to do with the transaction.

The June 20, 1946 letter stated the terms under which the plaintiff and the defendant were to operate in a continuing business relationship. It established, as plaintiff and defendant intended it should, the basis of that relationship. When the plaintiff, with the defendant's complete acquiescence and approval, confirmed and adopted the June 20, 1946 agreement, its provisions became the charter by which their dealings were governed. That both parties so regarded it is conclusively demonstrated by their continued performance in accordance with its terms. In the circumstances it is profitless to pursue any inquiry into Capitol's legal status in respect to the contract during the brief interval between June 20, 1946 and its clear and unequivocal adoption by the plaintiff and the entry of the parties on its performance.

Nor is it of great moment whether on the plaintiff's adoption of the contract it took effect as of June 20, 1946 or as of July 17, 1946. Plaintiff contends that even if a valid contract had been made in June, 1946, neither he nor the defendant was bound to the other prior to July 17 when the defendant, following plaintiff's request for the formal assignment of the contract to him, consented thereto. In a word, he contends that until July 17 he was free to sell or not to sell his bulk whiskey to defendant at any price or upon any terms. Plaintiff's insistence upon the latter date as the effective date of the contract seems to proceed upon the theory that during the hiatus period he was no longer bound by the OPA restrictions which expired on June 30th and therefore was not limited to the OPA prices prevailing in June and which had been specified in the June 20th letter. But this argument proves more than he contends for—and indeed it serves to emphasize the voluntary adoption and continued recognition of the June 20th letter as the agreement of the parties. Thus under this theory, since plaintiff was not bound prior to July 17th, he was free when controls were off to charge for his bulk whiskey whatever the traffic would bear. And of course he was also free voluntarily to limit himself

to the June OPA prices for his product if he chose to do so. The OPA price was a maximum and not a minimum price and the plaintiff, if not otherwise bound, was under no compulsion to get more than the June OPA maximum price for his bulk whiskey if it were to his advantage not to do so. Yet on July 12th he voluntarily delivered to the defendant the warehouse receipts for the 1,200 barrels at the June OPA maximum price as stipulated in the June 20, 1946 agreement and specified that it was in accordance with that agreement. He was under neither economic restraint nor compulsion when he, in the exercise of his business judgment, elected to adopt and abide by that agreement. During the hiatus period prices for bulk whiskey sky-rocketed and if, as plaintiff contends, he was not bound until July 17th to sell to the defendant, he was at liberty until that date to sell in the open and uncontrolled market or otherwise dispose of his merchandise, but preferred the advantages of the distributorship of the defendant's products and its firm commitment to sell him case goods.

This brings us to the question whether the agreement imposed on the plaintiff a price discrimination prohibited by the Robinson-Patman Act. The applicable provisions of the Act read as follows:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale * * * and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them * * * provided further, That nothing contained in sections * * * of this title shall prevent persons engaged in selling goods, wares, or merchandise in commerce from selecting their own customers in bona fide transactions and not in restraint of trade * * *." [5]

The plaintiff argues that although the price paid by him for the case goods was actually the same as that charged by the defendant to all its other New York wholesalers, he nevertheless paid more than they did because he had to sell his bulk whiskey for less than it was worth. In considering the question of whether there was a prohibited discrimination it will be assumed arguendo in plaintiff's favor that he was not, as the defendant insists, in pari delicto, and that the price at which he sold his bulk whiskey to the defendant was substantially less than that at which he would lawfully have sold it to others. For, if there was no adverse price discrimination that of itself is the end of the plaintiff's claim under the Robinson-Patman Act.

Analysis of the June 20, 1946 agreement and of the entire record leads to the conviction that the provision for the sale of the bulk whiskey was no part of the price of the sale of the case goods. The plaintiff had scarce aged bulk whiskey and the defendant had scarce nationally advertised case goods. Each had a product the other wanted. It may be acknowledged that plaintiff would not have sold his bulk whiskey unless he obtained the distributorship contract and the defendant's firm commitment to sell him case goods. And it may also be acknowledged that had the plaintiff not undertaken to sell the bulk whiskey the defendant would have been unwilling to designate the plaintiff its distributor and to obligate itself to deliver the 120,006 cases of its branded whiskey. This unquestionably was a factor which impelled the defendant to contract with the plaintiff; it was perhaps a strong motive for

5. 15 U.S.C.A. § 13(a).

the defendant's action. But it does not follow that the operation of this motive entered into the fixing of the price of the case goods. However potent as an influence on the defendant's course, in the contract itself the sale of the bulk and the sale of the case goods were independent of each other. Each stood entirely on its own footing and the terms of sale of the one formed no part of the terms of sale of the other. The purchases of the case goods were to be spread over a two and a half year period; the bulk whiskey was to be sold within a reasonable time. Plaintiff sold his bulk whiskey to the defendant at the maximum legal price. The defendant also sold its case goods to the plaintiff at the maximum legal price then prevailing and on the same terms as it fixed for the sale of like goods to all its other New York wholesalers. If anything the plaintiff was given preferred and more favorable treatment during a period of short supply than that accorded by defendant to any of its other distributors who were plaintiff's competitors. The plaintiff was the only distributor of defendant in New York City who had a firm commitment from the latter for the delivery of a specified and very substantial quantity of case goods for a fixed period. In the case of its other distributors in the New York area the defendant not only made no formal commitments for delivery of its nationally advertised brands but sold on an order to order basis. If the purchase of the bulk whiskey may be considered as entering into the transaction at all, there is no escape from the conclusion that the plaintiff received better not worse treatment—that he was favored and not discriminated against. There was no unlawful price discrimination which placed him at a competitive

disadvantage or offended the provisions of the statute.

Authority for the separability of the sale by the plaintiff of the bulk whiskey from the sale by defendant of the case goods is found in United States v. Henry Drew & Co., 6 Cir., 172 F.2d 555.[6] Though the case dealt with an alleged violation of OPA ceiling prices and not with the Robinson-Patman Act, it passed on a situation very similar to that presented here. It too grew out of the July, 1946 liquor shortage. The case involved an arrangement between the defendant, a distributor, and a distiller under which extra case goods were allotted to the distributor based in part upon warehouse receipts for bulk whiskey sold by the distributor to the distiller. The distributor's loss in the sale of the warehouse receipts was passed on by it to its retail dealers through the device of sale and repurchase of the warehouse receipts. The distributor sold to the participating retailers at OPA prices portions of the extra case allotment received by him from the distiller. The court rejected the government contention that the loss so borne by the retailers was an increase to them of the price of the case goods. Thus the case holds that the sale of the warehouse receipts for the bulk whiskey was separable from the sale of the case goods.[7]

▪ The determination that there was no discrimination forbidden by the Robinson-Patman Act disposes also of the plaintiff's further contention that the transaction was a "tie-in" sale in violation of the price control statutes. United States v. Henry Drew & Co., supra, is decisive on this point.[8]

▪ The plaintiff argues too that the defendant imposed on him a price discrimination prohibited by the New York

6. The reported Per Curiam opinion does not contain all the facts of the case; these were derived from the stipulation of facts contained in the record on appeal.

7. See also Gaddy v. Silverman, 86 Ga.App. 239, 71 S.E.2d 277.

8. For an example of a typical "tie-in" transaction and one subject to condemnation see Distilled Brands, Inc., v. Dunigan, 2 Cir., 222 F.2d 867. Cf. M. Kraus & Bros., Inc., v. United States, 327 U.S. 614, 616–617, 66 S.Ct. 705, 90 L.Ed. 894.

Alcoholic Beverage Control Act, § 101–b, subd. 2(a).[9] It does not appear that the discrimination so forbidden differs from that proscribed in the Robinson-Patman Act. It having been found that there was no price discrimination the plaintiff has failed to establish a violation of the New York statute. This makes it unnecessary to pass on the question discussed in the briefs whether if a violation had been shown, the plaintiff as a private person, in the absence in the statute of any provision for civil sanctions for violations, may maintain an action thereunder.

█ Plaintiff asserts an additional claim flowing from the defendant's sales of its products to the State Liquor Commissions of Pennsylvania and Ohio, so-called monopoly states. It is doubtful at best whether the Robinson-Patman Act applies at all to sales to Government agencies, state or federal. In any event, the plaintiff has offered no proof whatever that these sales in Ohio and Pennsylvania for which he was not licensed, affected him adversely. The court may not, as plaintiff urges, take judicial notice of the likelihood that these sales to nearby states must have injured him because ultimately consumers would purchase wherever it is cheaper to do so. It may not be amiss to point out that both the monopoly states Ohio and Pennsylvania wherein the sales were made which are the subject of plaintiff's claim are removed by many miles from the Metropolitan New York City area and Newburgh where plaintiff was granted a franchise for distribution of defendant's products.

Having utterly failed to establish either damage or the likelihood of damage from the sales to monopoly states the claim predicated thereon must also be dismissed.

Separate Findings of Fact and Conclusions of Law are filed herewith.

9. "It shall be unlawful for any person privileged to sell liquors or wines to wholesalers or retailers (a) to discriminate, directly or indirectly, in price, in discounts for time of payment or in discounts on quantity of merchandise sold, between one wholesaler and another wholesaler, or between one retailer and another retailer purchasing liquor or wine bearing the same brand or trade name and of like age and quality." McK.Consol. Laws, Alcoholic Beverage Control Law, § 101=b, subd. 2(a).