**UNITED STATES of America,**
**Appellee.**

**v.**

**NORTH CAROLINA GRANITE COR-**
**PORATION, Appellant.**

**No. 8188.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 5, 1961.

Decided March 27, 1961.

I. E. Carlyle and H. Grady Barnhill, Jr., Winston-Salem, N. C. (Womble, Carlyle, Sandridge & Rice, Winston-Salem, N. C., on the brief), for appellant.

James E. Holshouser, U. S. Atty., Greensboro, N. C. (Lafayette Williams, Asst. U. S. Atty., Greensboro, N. C., on the brief), for appellee.

Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.

SOPER, Circuit Judge.

This appeal is taken from a judgment of the District Court whereby the North Carolina Granite Corporation was sentenced to pay the minimum fine of $1000.-00 on each of ten counts of an indictment for violation of the Elkins Act, 49 U.S. C.A. § 41(1), by receiving a rebate in the transportation of property in interstate commerce at a less rate than that named in the tariffs published and filed by the common carrier with the Interstate Commerce Commission. In each count it was charged that the defendant had accepted and received a rebate from the Southern Railway Company by the device of falsely representing to the carrier that the value of the shipment was less than it actually was. For example, it was charged in the first count that the defendant on September 15, 1958, had accepted and received from the carrier a concession in the amount of $31.80 on a shipment of crushed granite weighing 80,500 pounds from Mount Airy, North Carolina, to Louisville, Kentucky, consigned by the defendant to itself, by the device of falsely representing to the carrier that the actual value of the crushed granite did not exceed $8.00 per ton when in fact the actual value did exceed that

sum, thereby obtaining transportation of the property at a less rate than that named in the applicable tariff published by the carrier and filed with the Interstate Commerce Commission.

The North Carolina Granite Corporation has its principal office at Mount Airy, North Carolina, where it operates a large stone quarry for the production of granite for buildings, bridges, and memorials. In conjunction with this business it also carries on a crushed stone operation for the production of bagged, crushed granite known as Gran-I-Grit which is fed to chickens to aid digestion. The market for crushed granite provides an outlet for what would otherwise be waste product and is highly competitive.

Evidence offered by the Government under the first count of the indictment showed that in September 1958 the defendant received an order for Gran-I-Grit from the Master Feed and Seed Company in Louisville, Kentucky, and, upon confirmation of the order, the terms of the contract of sale were stated as "$18.00 per ton delvd. in 50 lb. bags less $1.00 per ton Quan. Discount". The defendant shipped the goods to fill this order via the Southern Railway Company under a bill of lading which certified that "the actual value of the material described on this bill of lading is hereby stated by the shipper to be in excess of $4.00 per net ton but not in excess of $8.00 per net ton". This certification enabled the shipper to obtain a freight rate of $4.12 per ton under the governing tariff, which sets forth the rates applicable to certain commodities having an actual value not exceeding $8.00 per net ton at point of origin and so certified in the bill of lading. If the net purchase price of $17.00 per ton less the freight had been certified as the value of the goods at point of origin, the rate under the governing tariff would have been $4.91 per ton.

The shipment was consigned by the defendant to itself and at the same time the freight agent of the carrier at point of destination was directed by letter from the defendant to deliver the goods to

the purchaser. In explanation of this procedure, an expert industrial traffic manager employed by the defendant and other shippers testified that he had reluctantly advised the defendant to consign the goods to itself in order to secure a lower freight rate and meet competition with other shippers who were doing the same thing. His theory was that by this method the inventory cost became the value of the goods at the point of origin within the meaning of the tariff. In support of this theory the defendant offered testimony to show that the cost of the goods shipped, including expenditures for labor, supplies, insurance, administration, depreciation, advertising, and all other factors generally included in calculating the cost of a manufactured product, plus an allowance for general market conditions, amounted to $7.50 per ton. What was meant by the phrase "general market conditions" was not explained, and since it obviously did not take into account the selling price of the goods it may be disregarded. In short, the question is whether the cost of the goods is equivalent to the actual value of the goods at the point of origin within the meaning of the tariff when the shipper consigns them to himself at the point of destination.

■ We are of the opinion that the district judge was correct in rejecting this theory and in holding that the actual value of the goods in the hands of the shipper at the point of origin was the price at which they were sold less the freight. In this instance the selling price of the goods was $17.00 per ton less the freight to destination of $4.12 per ton, so that the net amount received by the defendant for the shipment was $12.88 per ton. In other words, the actual value of the goods at the point of origin exceeded the cost value of $7.50 per ton by the sum of $5.38 per ton and the failure of the defendant to certify the true facts enabled it to obtain an unlawful rebate and subjected it to the criminal penalties imposed by the statute.

■ The defendant contends that the sales price of the goods less the profit is not the actual value of the goods at the point of origin within the meaning of the tariff, and hence the Government failed to prove its case for the following reasons:

1. The sales-price-less-freight formula would not apply to all shipments by the same shipper, since it would not cover goods that are not shipped to a purchaser but are shipped by the manufacturer for storage or for its own use at another location.

2. The purchase price of goods consigned to the shipper relates to goods delivered to the point of destination and not to goods at the point of origin, and the price paid would be less if the purchaser had to take the risk of loss of the shipment with its potential burden of filing claims and collecting damages.

3. Under the Government's formula the actual value of the goods at the point of origin would vary with shipments to different localities because of variation in freight rates.

4. The selling price of goods depends upon the demand, which would not be the same at the point of origin as at the point of destination.

These suggestions, ingenious though they may be, do not undermine the Government's position. They merely show the varying conditions under which the Government's formula would be applied. A manufacturer who ships goods from one place to another for his own use would know the market price of his products and value them accordingly on the shipping document. The market for the goods would doubtless be affected by the increased cost of shipment to different points and the demand for the goods at the place of manufacture would doubtless be less in many instances than the aggregate demand at the destinations served by the carrier; but in every instance the shipper would know the market price of his goods and the net return he would receive before the shipment was made.

The circumstance that for its own purpose the defendant in this case chose to consign the goods to itself and thereby assume the risk of loss is likewise devoid of probative force. The defendant argues that a purchaser would pay less for goods shipped f. o. b. point of origin, since this would burden him with the risk of loss, but the risk of loss falls, in the first place, upon the carrier and there is no evidence in this case that it has any material effect upon the purchase price of the goods. Even if it has such an effect, the actual value of the goods at the time of the shipment is known to the shipper. Certainly in the pending case the defendant well knew that the value of the goods at the time of delivery to the carrier exceeded the certified value in the bill of lading.

Strong support for the judgment of the District Court is found in the decisions of the Interstate Commerce Commission, which are of great weight, since it is established that the interpretation as well as the reasonableness of the tariffs of carriers are subject, in the first instance, to the experienced determination of the Commission. See United States v. Western Pacific R. R. Co., 352 U.S. 59, 67, 77 S.Ct. 161, 1 L.Ed. 2d 126; Northwestern Auto Parts Co. v. Chicago B. & Q. R. Co., 8 Cir., 240 F.2d 743, 749. In two recent instances the Commission had under consideration the interpretation of rate schedules in which the carrier charged that the shipper had undervalued the shipments of crushed limestone contained in bags. The decision turned largely on whether the value of the bags should be included in the calculation of the actual value of the commodity at the point of origin. In Thompson-Weinman & Co. v. Louisville & N. R. Co., 303 I.C.C. 313, the Commission decided in favor of the carrier and specifically approved the rule laid down in its prior decision in Heywood-Wakefield Co. v. Ann Arbor R. Co., 161 I.C.C. 527, that the value to be taken into account in classification making is the manufacturer's selling price before the payment of freight charges and not the bare manufacturing costs.

The view that the definition of "actual value" involves a consideration of what the property can be sold for also obtains in other areas of the law. 1 C.J.S. p. 1437. Thus in Sibley v. Town of Middlefield, 1956, 143 Conn. 100, 120 A.2d 77, 80, where the issue was the construction for tax purposes of the statutory provision "present true and actual valuation", the court said "the expressions 'actual valuation,' 'actual value,' 'market value,' 'market price' and, we add, 'fair value,' are synonymous." See to the same effect Connecticut Savings Bank of New Haven v. City of New Haven, 1945, 131 Conn. 574, 41 A.2d 765. Again in State of Montana v. Peterson, 1958, 134 Mont. 52, 328 P.2d 617, an eminent domain proceeding under a statute which provided that actual value on the date of summons should be the measure of compensation, the court said that "actual value" is the "market value", i. e., the price that would in all probability result from fair negotiation where the seller is willing to sell and the buyer desires to buy.

The defendant makes the additional contention that the penal statute on which the indictment is grounded is unconstitutional insofar as it is based on the tariff, since the term "actual value" used in the tariff is too vague and uncertain to sustain a prosecution for crime under the rule laid down in such cases as M. Kraus & Bros. v. United States, 327 U.S. 614, 621, 66 S.Ct. 705, 90 L.Ed. 894, which involved a regulation of the Office of Price Administration. There is no substance in this point. The uncertainty of which the defendant complains rests not in the meaning of the tariff but in the variety of circumstances to which it must be applied, a condition commonly encountered in applying a governing statute to the facts of a particular case.

Affirmed.