**UNITED STATES of America, Plaintiff,**

v.

**SEABOARD AIR LINE RAILROAD COMPANY, Defendant.**

**Cr. No. 57–61.**

United States District Court
E. D. North Carolina,
Raleigh Division.
Jan. 6, 1964.

Robert H. Cowen, U. S. Atty., Raleigh, N. C., Theodore Polydoroff, Interstate Commerce Commission, Washington, D. C., for plaintiff.

Thomas F. Ellis, Raleigh, N. C., for defendant.

BUTLER, Chief Judge.

This is a criminal prosecution under 18 U.S.C.A. § 834, involving an alleged violation of the Interstate Commerce Commission's regulations for the transportation of explosives. Section 834 provides in pertinent part as follows:

"(a) The Interstate Commerce Commission shall formulate regulations for the safe transportation * * * of explosives * * * which shall be binding upon all carriers engaged in interstate or foreign commerce which transport explosives * * * by land * * *

"(f) Whoever knowingly violates any such regulation shall be fined not more than $1,000 or imprisoned not more than one year, or both; * *."

Pursuant to this section the Interstate Commerce Commission promulgated regulations governing the safe transportation of explosives. These regulations are contained in Title 49 of the Code of Federal Regulations. In addition to requiring cars containing explosives to be properly marked, Section 74.589 designates the proper position in a train of cars placarded "Explosives". The section provides:

"(g) * * * In a freight train or a mixed train either standing or during transportation thereof, a car placarded 'Explosives' shall, when length of train permits, be placed not nearer than the sixteenth car from both the engine or occupied caboose, except: * * *

"(2) When transported in a freight train made up in 'blocks' or classifications, a car placarded 'Explosives' shall be placed near the middle of the 'block' or classification in which moving, but not nearer than the sixth car from both the engine or occupied caboose.

"(3) When transported in a freight train or a mixed train performing pickup and/or setoff service, it shall be placed not nearer than the second car from both the engine or occupied caboose, * * *"

Section 74.589(a) also contains definitions of certain relevant words and phrases:

"(8) 'A train' is one or more engines coupled together with or without cars * * *

"(9) 'Freight train' means one or more engines coupled with one or more freight cars * * *

"(11) 'Mixed train' means one or more engines coupled with one or more freight cars and passenger cars carrying passengers * * *

"(13) 'Pickup and/or setoff service' shall be construed to mean trains in service that pick up and/or set off one or more cars at three or more stations enroute; trains having cars from which less-than-carload freight is loaded or unloaded enroute; or trains regularly scheduled to per-

form pickup and/or set-off service which on some days make less than three stops."

The Government contends that the train in question was made up in "blocks" or classifications, and relies upon subsection (2) which requires explosives cars to be placed at least six cars from the engine. The Seaboard, relying upon subsection (3), contends the train was engaged in "pickup and/or setoff service", and therefore the placarded car could properly be placed as the second car from the engine.

The facts in this case are not in dispute. On May 23, 1961, Seaboard was operating freight train No. 88 on its regularly scheduled run between Hamlet, North Carolina, and Richmond, Virginia, a distance of 247 miles. Stops were made along the line at Apex, Raleigh, and Henderson, North Carolina, and Alberta, Petersburg, Bellwood, and Richmond, Virginia. At each stop cars were delivered or added, or both. The consist of the train at Hamlet included a car, properly marked, containing 2,490 pounds of explosives for delivery at Henderson. At Apex, 15 miles south of Raleigh, 18 cars were uncoupled from the front of the train, whereupon the placarded car became the second car from the engine. When the train arrived at Raleigh, Mr. John R. Crosby, a Safety and Service Agent of the Interstate Commerce Commission, observed the placarded car in this position and notified Seaboard officials that the position of the car violated Interstate Commerce Commission regulations. Seaboard informed Mr. Crosby that it believed the train was engaged in pickup and/or setoff service as defined in Section 74.589(a) (13), supra, and therefore the car was properly placed. The Government offered testimony to the effect that train No. 88 was a "through" freight and as such was not engaged in pickup and/or setoff service, and further, that a train engaged in such service is a "local" freight.[1] The Government further contends that, despite its continuous designation as No. 88, the train that departed from Raleigh was a different train from the one that arrived because of a change of crew and consist, and therefore since only one stop was made between Hamlet and Raleigh the "train" was not performing pickup and/or setoff service as defined in Section 74.589(a) (13). The Government also contends that even if No. 88 is determined to be one train from Hamlet to Richmond, the work it performed cannot be categorized as pickup and/or setoff service.[2] The Government further interprets Sections 74.589(g) (2) and (g) (3) to be mutually exclusive and contends that since No. 88 was made up in "blocks" or classifications it could not also perform pickup and setoff service.[3]

On the other hand, Seaboard contends that the regulations do not limit the definition of pickup and/or setoff service to local freights, and that since No. 88 picked up and/or set off cars at three or more stations enroute it has complied

1. One of the Government's expert witnesses relied in part on Seaboard's timetable, advertisement, union contract, and pay scale in forming his opinion that train No. 88 was a through freight. However, another expert witness for the Government testified that such collateral matters are not controlling, and that the manner in which the particular train actually operates determines its status as through or local. The terms "through" and "local" freight are not defined in the regulations.

2. A Government witness testified that in his opinion pickup and setoff service referred to work performed by local freight trains in "spotting" cars at industrial sidings. Transcript, p. 112.

3. "Blocks" are groups of cars consigned to or originating at a specific point and so arranged that they can be picked up or set off in a group or "block" without additional switching. Transcript, p. 23. Blocks may be subdivided into "classifications" to facilitate delivery at various places at the point of destination. Transcript, p. 32. The regulations seem to imply that a train made up in blocks or classifications can perform pickup and setoff service. The definition of pickup and setoff comprises in specific terms *"one or more cars"*. [Emphasis added.]

with all applicable regulations. Seaboard also contends that even if the court interprets the regulations as urged by the Government, it cannot be found guilty beyond a reasonable doubt because the vagueness and ambiguity of the regulations preclude a finding that Seaboard "knowingly" violated them as required by 18 U.S.C.A. § 834(f).

 The problem involved here seems to be one of first impression in the courts. From a careful study of the regulations and the evidence presented, the only thing that seems clear is the lack of clarity itself. The Government contends that the regulations are remedial statutes and, as such, should be liberally construed, and that the court may turn to expert witnesses for the purpose of clarifying ambiguities. However, in Boyce Motor Lines v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952), also involving regulations enacted pursuant to 18 U.S.C.A. § 834, the United States Supreme Court said: "A criminal statute must be sufficiently definite to give notice of the required conduct to one who would avoid its penalties, and to guide the judge in its application and the lawyer in defending one charged with its violation." In Connally v. General Construction Company, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926), the Court cited with approval United States v. Capital Traction Company, 34 App.D.C. 592, 19 Ann. Cas. 68, to the effect that: "A criminal statute cannot rest upon an uncertain foundation. The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue."

Applying the above standards to the regulations involved in this case it appears that the defendant's charge of vagueness is well taken. Moreover, the uncertainty would still exist even if the rule of construction urged by the Government were applied. Expert testimony for the purpose of clarification is of little value when the experts themselves disagree on material matters. For example, Mr. Crosby, a witness for the Government, testified that in his opinion train No. 88 only "delivered" cars in interchange and that this was not pickup and setoff service, while his superior, Mr. William H. Woerner, another Government witness, testified that train No. 88 picked up and set off cars at three or more stations over its entire route. In addition, there are numerous terms in the regulations which the court, even with the aid of expert testimony, has not been able to interpret satisfactorily. To illustrate, the definition of pickup and/or setoff service—"trains in service that pick up and/or set off one or more cars at three or more stations enroute" —leaves the meaning of "trains", "stations", and "enroute" subject to conjecture.[4]

 To find the defendant guilty in this case would require the court not only to interpret the regulations as urged by the Government, but to find also that the defendant *knowingly* violated these regulations. Thus it must be shown that the defendant knew the regulations required the placarded car to be placed at least six cars behind the engine and yet voluntarily and purposely, and not because of mistake or inadvertence, violated such requirement, or that the defendant *wilfully neglected* to ascertain the requirements. Boyce Motor Lines v. United States, supra. The Government in its brief urges that the requirement of "knowingly" is met if the court finds the defendant had "a specific wrongful intent to violate the regulations of the Interstate Commerce Commission" or that it "wilfully neglected" to comply with the regulations. The Government urges that such a finding would be justified by the fact that the defendant's yardmaster stated he knowingly permitted

---

4. The regulations fail to define "stations" or "enroute". The definition of a freight train—"one or more engines coupled with one or more freight cars"—sheds no light on the present controversy.

the placarded car to be placed as the second car from the engine, and that he and other Seaboard officials admitted they were aware of the provisions of the regulations. Such a conclusion does not seem warranted under the circumstances. A Seaboard official testified that the company had always considered train No. 88 as a pickup and setoff train and that it had at all times endeavored to comply with the regulations. The fact that the defendant was familiar with the regulations as written does not mean that the defendant was guilty of "wilful neglect" in failing to ascertain their meaning, as interpreted by the Government, when the regulations lack the clarity required of criminal statutes and are susceptible of different constructions. In view of the vague and indefinite nature of the regulations, it cannot be found from the totality of the circumstances and the inferences which may be reasonably drawn therefrom that the defendant "knowingly" violated such regulations.

Defendant's motion for judgment of acquittal is allowed. It is so ordered.