UNITED STATES of America

v.

ILLINOIS CENTRAL RAILROAD COMPANY, a Corporation.

Crim. No. 9701.

United States District Court
W. D. Tennessee, W. D.

May 31, 1967.

Henry L. Klein, Asst. U. S. Atty., Memphis, Tenn., for plaintiff.

Jesse E. Johnson, Jr., Burch, Porter & Johnson, Memphis, Tenn., for defendant.

## MEMORANDUM DECISION

BAILEY BROWN, Chief Judge.

In this case, by criminal information, the United States has charged the Illinois Central Railroad Company in two counts with violation of a safety regulation of the Interstate Commerce Commission. A jury trial was waived, and the case was heard on a stipulation of facts, with exhibits, and testimony of witnesses, with additional exhibits, after which the Court took the case under advisement.

Title 18, U.S.C.A., Sec. 834 directs the I.C.C. to promulgate regulations for the safe transportation of explosives and other dangerous articles and further provides that whoever knowingly violates such regulations shall be subject to a criminal penalty. Pursuant to this authority, the I.C.C. promulgated a regulation (49 C.F.R. 74.589(j) (5)) which provides:

"(j) *Separating loaded tank cars placarded 'Dangerous' from other cars in trains.* In a freight train or mixed train either standing or during transportation thereof, a placarded loaded tank car must not be handled next to:

\*   \*   \*   \*   \*   \*   \*

(5) Any car placarded 'Poison Gas' or 'Flammable Poison Gas.'"

Moreover, in this same regulation, a "freight train" is defined as follows:

" 74.589   Handling cars.

(a) *Definitions.*

\*   \*   \*   \*   \*   \*   \*

(9) 'Freight train' means one or more engines coupled with one or more freight cars, displaying markers; \* \* \*."

In the information, it is charged that on February 19, 1964, the Railroad knowingly violated this regulation by handling two cars placarded "Dangerous" next to a car placarded "Flammable Poison Gas." The principal defense of the Railroad is that the train in which the cars were handled was not a "freight train" within the meaning of the regulation because it was not "displaying markers" and that therefore the Railroad was not prohibited from handling the cars as it did.

The Railroad, prior to the first trial, filed a motion for a bill of particulars. The criminal information as originally filed charged that the cars were handled in a "transfer train" and the Railroad

sought to have the Government be required to describe such a train, since a "transfer train" is not defined in the regulations. The Railroad also sought to have the Government be required to allege whether the train in question was "displaying markers," since, the Railroad contended, it would not be a "freight train" unless it was "displaying markers." The Government then moved and was allowed by Judge Marion S. Boyd, now retired, to amend the criminal information to allege that the train was a "freight train" rather than a "transfer train." Judge Boyd denied the application to require the Government to allege whether the train was "displaying markers" on the ground that such words were surplusage in the definition of a "freight train" in the regulation and that a train could be a "freight train" whether or not it was "displaying markers." The case then was tried by Judge Boyd with a jury, and though the proof was undisputed that the train had no markers, he charged the jury as a matter of law that it was a "freight train." In view of the further undisputed proof that the Railroad did handle the two cars placarded "Dangerous" next to a car placarded "Flammable Poison Gas," this charge to the jury almost amounted to a direction to find the Railroad guilty. However, the jury failed to agree on a verdict and was finally discharged. We understand that the Government, in its argument to the jury, apparently on the theory that the Court's charge still left the question open and that the jury was to interpret the regulation, contended that the train was a freight train if it was "displaying markers or should be displaying markers." This argument to the jury may have caused confusion and the inability of the jury to agree. In any event, it is no longer contended by the Government that the definition of a "freight train" in the regulation should be so construed; the Government now contends only, as Judge Boyd ruled, that the words "displaying markers" are surplusage and that the train in question was a "freight train" even though it was not "displaying markers."

Prior to the second trial, at a conference with counsel, this Court suggested the possibility of the Government again amending the criminal information by affirmatively alleging that the train in question was not displaying markers, that the Railroad file a motion to dismiss, and the Court then decide this question of law on this motion to dismiss. We pointed out that if we decided this question of law against the Government on a motion to dismiss, the Government could appeal, but that if we decided this question against the Government after the case went to trial, this being a criminal trial, the Government could not appeal. The Railroad indicated a willingness to accept this suggestion but the Government refused.

Based upon the stipulation, testimony and exhibits, we find the facts, as to which there is no real dispute, as follows:

On February 19, 1964, at Memphis, Tennessee, the Railroad, a common carrier engaged in the transportation of property in interstate commerce for hire, caused its Engine No. 465 to transport loaded tank car DUPX 7420 (which was placarded "Dangerous" and which contained hydrogen peroxide [70%]) immediately in front of a loaded tank car DUPX 8117 (which was placarded "Flammable Poison Gas" and which contained hydrocyanic acid), which latter car was followed immediately by loaded tank car NATX 21277 (which was placarded "Dangerous" and which contained acrylonitrile). Under the I.C.C. regulations, hydrogen peroxide [70%] and acrylonitrile are classified as dangerous substances, and hydrocyanic acid is classified as a flammable poison gas. The cars were thus properly placarded.

The movement, consisting of an engine and sixty-three freight cars, originated in defendant's North Yard, located near the northern boundary of the City of Memphis. From there, the freight cars were transported to the Railroad's South Yard, a distance of approximately four

miles, all within the City of Memphis. The transportation was over a main line track of the Railroad, and no switching was performed between those two points. At the Railroad's South Yard, one of the sixty-three cars was set off (not one of the three cars mentioned above), and the movement, consisting of the same engine and sixty-two cars, then proceeded from South Yard to the Railroad's Johnston Yard, located near the southern boundary of the City of Memphis, a distance of approximately four additional miles over a main line track of defendant. No switching was performed between South Yard and Johnston Yard. From North Yard to South Yard, the main line track of the Railroad runs along the Mississippi River between downtown Memphis and the river bank; and from South Yard to Johnston Yard, the main line track of the Railroad runs through a highly industrialized area and then through a residential section.

"Markers" are not defined in the regulations. However, the proof shows that markers, which formerly were lanterns but which now are reflectors, are placed in brackets on the caboose to indicate that the train is complete and is operating on the main line. The proof further shows that here there was neither a caboose nor a marker on the train and that the last car, a tank car, had no brackets for mounting markers. It further appears that one railroad, not this one, does not even place markers on trains moving from Cincinnati to New Orleans. The regulations are silent as to when markers should be displayed.

The Railroad has never used markers in the Memphis area for movements of this nature. The train was not considered by the Railroad to be a freight train movement but one within the terminal area. This engine had 1200 horsepower and was capable of a maximum speed of 45 miles per hour as compared with engines used in inter-city movements which have 1500 to 3000 horsepower and are capable of a maximum speed of 79 miles per hour. The employees handling this movement were on a separate seniority roster from those who handle movements to and from cities some distance from Memphis. On a long-distance haul, the Railroad's trains hauling freight reach speeds of 60 miles per hour, whereas this movement was conducted at a speed of 10–12 miles per hour and a city ordinance limits speed within the city to a maximum of 20 miles per hour. The possibility of derailment and hot boxes is much greater at higher speeds. On long-distance runs, the Railroad does use cabooses and markers.

The Government contends that unless the words "displaying markers" in this safety regulation are treated as surplusage, a railroad may avoid the application of the regulation to a train movement such as this, as to which it was obviously intended that the regulation should apply, by simply not displaying markers. The Railroad contends that, with respect to a train movement such as this, it was not even intended that the regulation should apply; further, that the regulation must, since violation carries a criminal penalty, be strictly construed, thus making it impermissible to treat these words as surplusage; and further that if it be true that railroads are avoiding the application of this safety regulation by not displaying markers when they should be, the I.C.C. should amend the regulation by redefining a "freight train."

The only case cited by counsel that specifically deals with the question whether a train may be a "freight train" under this regulation even though it does not display markers is United States v. Tennessee Central Railway Co., in the Middle District of Tennessee, unreported, relied upon by the Government. The Government submitted to us only a transcript of a brief colloquy between court and counsel, and it is obvious that the point involved here was not clearly brought to the attention of that court. The Government also relies on United States v. Chicago, Burlington & Quincy Railroad Co., 237 U.S. 410, 35 S.Ct. 634, 59 L.Ed. 1023 (1915), which held that the Safety Appliance Act, which was made applicable

" * * * to all trains * * * on any railroad engaged in interstate commerce," applied to an engine pulling a cut of cars from one yard to another yard over a main line track of the railroad, though it carried no caboose or markers. However, it appears that the Act contained no definition of a "train"; moreover, the Court was dealing with a statute that provided for a civil, not a criminal, penalty.

■■■ Here we are dealing with a regulation issued by the I.C.C., for the alleged violation of which a criminal penalty is sought. It is clearly the law that criminal statutes must be strictly construed in favor of the accused and that all reasonable doubts concerning their meaning must be resolved in favor of the accused. Pierce v. United States, 314 U. S. 306, 62 S.Ct. 237, 86 L.Ed. 226 (1941); and North American Van Lines, Inc. v. United States, 243 F.2d 693 (6th Cir. 1957), and cases cited therein. This rule of construction applies, of course, to a regulation which defines a crime. M. Kraus & Bros., Inc. v. United States, 327 U.S. 614, 66 S.Ct. 705, 90 L.Ed. 894 (1946).

The case of United States v. A & P Trucking Corp., et al., 113 F.Supp. 549 (D.C.N.J.1953) is particularly applicable here. The defendant was charged with violating an I.C.C. regulation which provided that motor vehicles transporting flammable liquids must be placarded and flammable liquids were defined in the regulation as "any liquid which gives off flammable vapors (as determined by flash point Tagliabue's open-cup tester, as used for test of burning oils) at or below a temperature of 80° F." Defendant was found guilty by the jury, after which he moved for a judgment of acquittal on the ground that, though the Government had introduced proof that the liquids were flammable by other tests, it had not shown them to be flammable by the test prescribed by the regulation. After reviewing to some extent the history of the rule that "statutes creating crimes are to be strictly construed in favor of the accused," the Court concluded:

"The plain meaning of the regulation applies the criminal sanction to persons unlawfully transporting such articles as are flammable according to a prescribed test and standard: 'determined by flash point from Tagliabue's open-cup tester.' The government may not disregard this definitive provision. It is the essential test to convict under the applicable regulations. If the test seems unduly restrictive, as to method, and the brand of testing equipment, it is for the administrative body to provide for the use of *any* generally accepted and approved testers which can fairly and accurately serve the purpose intended.

"Defendant's motion to set aside the verdict is granted and a judgement of acquittal will be entered."

See also: United States v. Seaboard Air Line Railroad Co., 225 F.Supp. 38 (DCNC 1964).

■■■ We therefore conclude that, whether or not it can be said that this safety regulation was actually *intended* by the I.C.C. to apply to a train movement such as this, it did not apply to this train movement, since the train was not "displaying markers" and therefore was not a "freight train" within the meaning of the regulation. Since the I.C.C. quite apparently believes that this safety regulation, in the interest of the safety of train crews and the public, should apply to train movements such as this, it can amend the regulation to make it applicable. In 18 U.S.C.A., Sec. 834, which directs the I.C.C. to issue safety regulations, it is provided in subsection (b): "The Commission, of its motion, * * * may make changes or modifications in such regulations, made desirable by new information or altered conditions.

Accordingly, we find the defendant, Illinois Central Railroad Co., not guilty. A judgment will be prepared by counsel for entry.