UNITED STATES of America,
Plaintiff–Appellee,

v.

PITT–DES MOINES, INC.,
Defendant–Appellant.

No. 98–1767.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 27, 1998.

Decided Feb. 18, 1999.

**980**

Mark S. Hersh (argued), Office of U.S. Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

R. Henry Moore (argued), Buchanan Ingersoll Professional Corp., Pittsburgh, PA, for Defendant–Appellant.

Before CUMMINGS, CUDAHY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

During construction of the U.S. Postal Service's ("USPS") General Mail Facility on West Polk Street in Chicago (the "post office project"), part of the steel structure collapsed, killing two ironworkers. Following an investigation by the Occupational Safety and Health Administration ("OSHA"), a federal grand jury indicted Pitt–Des Moines, Inc. ("PDM"), the steel erection subcontractor on the project, for willfully violating provisions of the Occupational Safety and Health Act (the "Act") resulting in the two deaths. A jury found PDM guilty, and it was fined $1,000,000 and placed on probation for five years. The contractor appeals, challenging a number of the district court's rulings. We now affirm PDM's conviction.

## Background

Before breaking ground on the post office project, the USPS selected Hyman/Power as the general contractor and Turner/Ozanne as the USPS's on-site representative. Hyman/Power then contracted with PDM to fabricate and erect the structural steel for the project. PDM in turn subcontracted out part of the steel erection work to MA Steel. Both PDM and MA Steel hired workers from Local 1 of the Ironworkers Union, and construction began in March 1993.

Steel erection takes place in three phases. First, during "raising", a raising gang hoists the steel members [1] from the ground by crane, placing each member on the steel structure and temporarily connecting the pieces together with bolts. Next, the connections between the pieces are straightened and secured during "bolt-up". Here, a crew follows the raising gang, adding additional bolts, replacing and tightening them if necessary and checking to see that the structure is properly aligned. Finally, welders follow the bolt-up crew making the structure permanent by welding each connection. The lag time between each phase is typically a day or two. This was the procedure followed by PDM and MA Steel during the post office project.

Soon after the steel erection began, a representative of Turner/Ozanne, Ralph Miserindo, noticed that PDM's raising gang was installing only one bolt in some horizontal beams after hoisting them into place. Concerned that a single bolt would not secure the beams until the bolt-up crew added more, Miserindo consulted an OSHA manual and located 29 C.F.R. § 1926.751(a) (the "connection rule"). This regulation required that, during the raising phase, horizontal beams be attached with two bolts (or the equivalent) tightened "wrench tight" with nuts. Miserin-

---

1. The term "members" refers to steel beams used during structural steel assembly. *See* 29 C.F.R. § 1926.751.

do recorded his observations in a field report and sent it to Hyman/Power. On March 11, 1993, Jay Meyer, Hyman/Power's General Superintendent, forwarded the report along with a copy of the connection rule to Monk Mann, the General Manager of PDM. Mann responded by letter suggesting that PDM's practice complied with the connection rule because it was installing stronger bolts than the regulations anticipated. Thus, Mann implied, the single bolt PDM used at the connections was equivalent to the two bolts prescribed by the rule. Monk's letter was sent to Turner/Ozanne who replied that it still considered PDM's practice to be in violation of the rule and that "discussions with OSHA confirm [Turner/Ozanne]'s interpretation and [they] stated that they are unaware of any allowed deviation." Turner/Ozanne then requested that PDM use two bolts at all connections. On April 6, 1993, Hyman/Power sent PDM a Contract Non–Conformance Notice because "one bolt connection [was] still being practiced by PDM." Additionally, some of the ironworkers on the construction site complained about the way PDM's raising gang was making its connections, claiming the steel was "unsafe," "shaky" and "loose."

Despite these warnings, PDM apparently never altered its connection practice, nor did it tell its ironworkers about the connection rule or how to comply with it. The contractor simply let its raising gang members decide how to make each connection. Thus some connections had less than two bolts, some had no nuts and others had nuts that were not tightened.

Approximately 1,300 of the 30,000 connections required on the project involved seat angles. A seat angle is an L-shaped piece of rolled steel with holes on the vertical and horizontal legs. The vertical leg is bolted to the steel column. The horizontal leg has two holes which line up with two holes on the bottom flange of a beam, so that once a beam is rested on top of the seat angle, it could be connected with two bolts. PDM, however, typically installed only a single bolt through the beam and horizontal leg of the seat angle

and apparently did not tighten the connection during the raising phase.

On November 3, 1993, one of these seat angles failed, dropping the beam which had been placed on it the day before and triggering a collapse of part of the steel structure. Two ironworkers were killed in the crash: Patrick Newsome, a member of PDM's raising gang, and Larry Thormeyer, a bolt-up crew foreman working for MA Steel.

Following the accident, OSHA commissioned civil engineering professors at Purdue University to study the cause of the seat angle failure. Based on simulations of the accident, the professors concluded that two bolts wrench tight had not been used at the connection between the seat angle and the beam it held. At most, they determined, PDM had used only a single bolt with no nut.[2]

In August 1996, a Federal Grand Jury handed up a two count indictment of PDM pursuant to 29 U.S.C. § 666(e). Section 666(e) makes any willful violation of OSHA safety standards resulting in the death of "any employee" punishable by fines or imprisonment. Count I charged PDM with knowingly and willfully violating the connection rule (29 C.F.R. § 1926.751(a)). It also charged PDM with willfully violating 29 C.F.R. § 1926.21(b)(2), known as the "training rule," requiring employers to instruct each of their employees in the safety regulations applicable to a given work site. These violations, the count charged, resulted directly in the death of Newsome. Count II charged that the same violations led to the death of Thormeyer.

The original indictment alleged that both Newsome and Thormeyer were employed by PDM. Prior to trial, the district court ruled that under the "multi-employer doctrine" the government only needed to prove that Thormeyer was an employee at the work site; it did not need to prove that he was PDM's employee to establish a violation of Section 666(e). Following this ruling the government issued a superseding information containing the same charges as the indictment,

**2.** At trial, William Stone, the ironworker who had made the connection the day before, testified for PDM that he had used two bolts to connect the beam and the seat angle but only one of them had a nut on it. This nut was apparently only "spun-on" and not tightened.

but claiming that Thormeyer was employed at the work site, but not by PDM.

In November 1996, PDM filed a motion to dismiss arguing that the safety standards it was alleged to have violated—the connection rule and the training rule—were unconstitutionally vague. The court denied the motion as well as PDM's motion in limine to exclude evidence about connections other than the one that failed. The court then granted the government's motion to exclude some of PDM's evidence regarding the industry custom and practice of steel erection, and granted its motion to restrict the use of evidence of the design of the seat angle involved in the accident. The court also denied PDM's motion to quash the superseding information. Finally, it denied PDM's request at trial to admit the original OSHA citation and complaint which characterized PDM's violations as "serious" instead of "willful."

A jury found PDM guilty on both counts and the court imposed a fine of $1,000,000 and placed the company on probation for 5 years. PDM now appeals, challenging each of the district court's rulings.

## Analysis

### Multi–Employer Doctrine

■ Applying the multi-employer doctrine, the district court held that PDM could be liable under 29 U.S.C. § 666(e) for the death of Thormeyer without proof that he was PDM's employee so long as the government could show that he was an employee of the work site exposed to the risk created by the contractor's safety violations. PDM now challenges this decision, claiming that the doctrine is inconsistent with the plain language of Section 666(e) and the purposes of the Act, and that it runs counter to the rule of lenity.[3] However, none of PDM's objections to the district court's use of the doctrine are convincing and, although this circuit has never applied it before, we are persuaded by the reasoning of the courts that have.

■ The doctrine holds that on multi-employer work sites, an employer who cre-ates a safety hazard can be liable under the Act regardless of whether the employees threatened are its own or those of another employer on the site. *Anthony Crane Rental, Inc. v. Reich,* 70 F.3d 1298, 1305 (D.C.Cir. 1995); *Brennan v. OSHRC,* 513 F.2d 1032, 1038 (2nd Cir.1975). Courts which have adopted the doctrine cite for statutory support the duties imposed on employers by Section 654(a) of the Act. These duties are two-fold:

Each employer—

(1) Shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees.

(2) Shall comply with Occupational Safety and Health standards promulgated under this chapter.

29 U.S.C. § 654(a). The first duty requires employers to protect their own employees from obvious hazards even when those hazards are not covered by specific safety regulations imposed by the Act. *Teal v. E.I. DuPont de Nemours & Co.,* 728 F.2d 799, 804–05 (6th Cir.1984). This duty is considered general because it asks employers to protect employees from all kinds of serious hazards, regardless of the source. *Id.*; *see Anning–Johnson Co. v. OSHRC,* 516 F.2d 1081, 1086 (7th Cir.1975). Although general, the words "his employees" indicates that the duty imposed by 654(a)(1) is limited to an employer's own employees. *See Brennan,* 513 F.2d at 1038. Section 654(a)(2), on the other hand, contains no such limiting language. Courts have interpreted this provision as imposing a specific burden on employers to comply with and carry out the Act's safety standards regardless of whom in a given workplace is threatened by non-compliance. Unlike Section 654(a)(1), which imposes a general duty to a specific class, 654(a)(2) implies a specific duty to a more general class. *Id.* Thus, courts have held that when an employer on a work site violates a safety regulation, it can face liability

---

**3.** We review the district court's interpretation of the Act de novo. *United States v. Devenport,* 131

F.3d 604, 605 (7th Cir.1997).

under the Act regardless of whether those exposed to the resulting danger were the employer's own employees or those of another. *Id.*; *Teal*, 728 F.2d at 804; *Beatty Equipment Leasing v. Secretary of Labor*, 577 F.2d 534, 537 (9th Cir.1978).

While Section 654(a)(2) provides the statutory basis for the multi-employer doctrine, courts garner additional support for it from the underlying purpose of the Act. The Act's broad remedial scope is designed "to assure as far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651; *Brennan*, 513 F.2d at 1038; *Beatty*, 577 F.2d at 537; *Marshall v. Knutson Construction*, 566 F.2d 596, 600 n. 7 (8th Cir.1977). As courts have determined, the Act's legislative history suggests that its primary focus was making places of employment, rather than specific employees, safe from work related hazards. *See Brennan*, 513 F.2d at 1038. This implies that "once an employer is deemed responsible for complying with OSHA regulations, it is obligated to protect every employee who works in its workplace." *Teal*, 728 F.2d at 805. Therefore, the combination of Section 654(a)(2)'s broad language and the goal of safer workplaces have led courts to conclude that the multi-employer doctrine is fully consistent with the Act.

However, while a majority of the courts to address the issue have come to this conclusion, at least one has not. PDM relies on a decision from the Fifth Circuit, *Melerine v. Avondale Shipyards*, 659 F.2d 706 (5th Cir. 1981), for the proposition that the multi-employer doctrine is incompatible with the Act. In *Melerine*, the Fifth Circuit reasoned that the duties of Section 654(a)(1) and (2) must be read together and that both are limited to an employer's own employees. *Id.* at 712. That court also found no evidence in the Act's legislative history sanctioning the creation of a multi-employer doctrine. *Id.* at 711. Finally, citing our decision *Anning–Johnson*, the court concluded that holding several employers responsible for one employee's safety could create confusion and ultimately prove counterproductive. *Melerine*, 659 F.2d at 711 n. 17 (citing 516 F.2d at 1089).

*Melerine*, however, does not persuade us that the doctrine is an inappropriate byproduct of the Act's language or purpose. While the Fifth Circuit's reading of the language of Section 654(a) is reasonable, we consider a less narrow interpretation of the duties it imposes more compelling. The use of the words "his employees" in describing the duties of Section 654(a)(1) and the conspicuous absence of any limiting language in Section 654(a)(2), certainly indicate that a broader class was meant to be protected by the latter. *See Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion."). As noted above, each clause has a different focus and purpose. There is no reason to conclude that the specific protection Section 654(a)(2) affords—freedom from safety violations—is limited to an employer's own employees. This is particularly true when employees of different employers work in close proximity and all are subject to the risk those violations create.

Next, while we are aware of no explicit authorization in the legislative history for the imposition of liability under the multi-employer doctrine, we have found none precluding it. As this court has observed, the congressional record relating to multi-employer job sites is sparse: "In enacting this law, Congress apparently gave little thought to the unique relationship which arises when employees of a number of different employers work in and around the same job site and are subject to the hazards which may exist at that site." *Anning–Johnson*, 516 F.2d at 1087 n. 14 (citations omitted). In the absence of specific guidance, this court must attempt to render an interpretation of the Act which best fulfills the "stated congressional purpose in an equitable manner." *Id.* at 1087. Without the doctrine, employers could avoid OSHA liability for the hazardous conditions they create merely because the threatened or harmed workers—although their presence was entirely foreseeable and

they are covered by the Act—happen to be on the payroll of another. Indeed this would be true even when, as here, the violating employer was the only one on the site who could reasonably have prevented the harm. We do not believe that this is the result Congress intended by enacting Section 654(a). Because we consider the multi-employer doctrine to be more consistent with the Act's broadly remedial purpose, we decline to adopt the Fifth Circuit's interpretation of the absence of any explicit authorization in the Act's legislative history.

Third, we read nothing in our decision in *Anning–Johnson* which would prevent the application of the doctrine. In that case, we held that a subcontractor was not liable for its employees' exposure to hazardous conditions at a construction site. 516 F.2d at 1090. The critical fact was that the subcontractor had not created, nor was it contractually responsible for, the hazardous condition. *Id.* at 1082.[4] Imposing liability in that situation was inappropriate in part because it ran the risk of creating confusing and overlapping liability. *Id.* at 1089. That risk is not implicated here because PDM created the hazard, and was the only entity on the site that could reasonably have remedied it. The doctrine only seeks to hold liable those employers who actually create hazardous situations by violating safety standards.[5]

■ Finally, PDM argues that because courts have never used the multi-employer doctrine under Section 666(e), principles of lenity preclude the imposition of liability here. However, while no court has yet applied the doctrine to Section 666(e), none have held it inappropriate in this context either. The section provides in relevant part:

> Any employer who willfully violates any standard, rule, or order promulgated pursuant to section 6 of this Act, or of any regulations prescribed pursuant to this

Act, and that violation caused death to any employee, shall, upon conviction, be punished by a fine of not more than $10,000, or by imprisonment of not more than six months, or by both.

29 U.S.C. § 666(e). Nothing in the language of the statute prevents the application of the multi-employer doctrine nor does it implicate principles of lenity. The rule of lenity requires courts to read ambiguous criminal statutes narrowly "to ensure both that there is fair warning of the boundaries of criminal conduct and that legislatures, not courts, define criminal liability." *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990). However, the language in Section 666(e) spelling out the conduct creating liability is not ambiguous: willful violations of safety regulations resulting in the death of any employee create liability. The use of the term "any" is significant. Reading the statute as a whole, *see id.,* Congress clearly drew a distinction between "his employees" (*see* 29 U.S.C. § 564(a)(2)) and "any employees." The latter indicates that the class of employees whose deaths will trigger it is broader than those of the violator. Thus, the language of the statute itself indicates that the multi-employer doctrine is a particularly appropriate vehicle for holding employer liable for violations of Section 666(e). In addition, the doctrine is routinely used by other circuits to hold employers civilly liable for violations of safety standards. *See Brennan,* 513 F.2d at 1038; *Teal,* 728 F.2d at 804; *Beatty Equipment Leasing,* 577 F.2d at 537. When those same violations are willful and result in death to any employee, the penalties increase. There is no obvious reason to conclude that when the employee is killed by a willful violation instead of only threatened, the violating employer escapes liability. The clear language of the statute, combined with the doctrine's wide acceptance and long history in cases involving civil penalties, gave PDM fair warning of its potential liability.[6] Therefore, because

---

4. Fundamental to the *Anning–Johnson* court's holding was that imposing liability for hazardous conditions the employer neither created nor was responsible for was inconsistent with the language and legislative history of the Act itself. 516 F.2d at 1088.

5. Although the issue was not before it, the *Anning–Johnson* court cited cases employing the doctrine with apparent approval. 516 F.2d at 1091 n. 21.

6. PDM's reliance on *M. Kraus & Brothers v. United States,* 327 U.S. 614, 621, 66 S.Ct. 705, 90 L.Ed. 894 (1946) is misplaced. In *M. Kraus,* the

none of PDM's arguments convince us otherwise, we adopt the multi-employer doctrine to assess violations of 29 U.S.C. § 666(e).

■■■ While we consider this an appropriate basis for establishing an employer's potential liability, we emphasize that multi-employer liability has limits. While the Act seeks to create safer working environments, "it is clear that the Act is not nor could it be designed to eliminate all occupational accidents. Rather it is designed to require 'a good faith effort to balance the need of workers to have a safe and healthy work environment against the requirement of industry to function without undue interference.'" *Anning–Johnson*, 516 F.2d at 1088 (citations omitted). Because construction sites often entail different employees being exposed to hazards created by more than one employer, the affected employees on a work site should be afforded the full protection of the Act regardless of their employer. Yet the class of employees who will trigger liability under the multi-employer doctrine should be limited to those with regular access to the areas controlled or directly impacted by the employer accused of violating a safety regulation. Although the logical class is composed of those on a given work site, it may in certain circumstances be narrower. As the Second Circuit implied in *Brennan*, the doctrine is limited to exposure by the employees of the violating employer "or those of other employers engaged in a common undertaking." 513 F.2d at 1037. While we need not decide the exact contours of the doctrine here, it is enough to emphasize that at a minimum it excludes exposure by a "passerby or unrelated third persons." *Id.* at 1038, n. 10.[7]

■■■ This limitation, however, is not exceeded here, and it was appropriate for the district court to hold that PDM could be liable for the death of Thormeyer under the multi-employer doctrine. Thormeyer was employed as an ironworker on the Post Office work site. His job was to follow PDM's raising gang and bolt-up the connections they made. He belonged on the site and regularly worked within the zone of danger created by any unsafe connections. Thormeyer was an entirely foreseeable victim of any willful safety violations PDM may have committed and thus easily fell within the multi-employer doctrine.

### Superseding Information

■■■ PDM next argues that the district court committed reversible error by allowing the government to replace the original indictment, alleging that Thormeyer was PDM's employee, with a superseding information, alleging that he was merely an employee on the job site. The contractor claimed that this amounted to an unfair amendment of the indictment. The district court agreed that the information did amend the indictment because, by allowing a jury to convict PDM for causing the death of someone not in its employ, it broadened the offense contained in the original charge. *See United States v. Leichtnam*, 948 F.2d 370, 377 (7th Cir.1991). However, the court did not agree that this was necessarily improper and noted that some difference of opinion exists among (and even within) federal courts over this issue. *Compare United States v. Fischetti*, 450 F.2d 34, 39 (5th Cir.1971) (government may not amend an indictment with information prior to trial), *and United States v. Goldstein*, 502 F.2d 526 (3rd Cir.1974) (en banc) (same), *with United States v. Brewer*, 681 F.2d 973, 974 (5th Cir.1982) (per curiam) (indictment may be amended with superseding information because "there is no constitutional right to an indictment if the offense charged is a misdemeanor."). Following what it called

defendant was accused of "evading" maximum price regulations, but the statute did not define what constituted evasion. The Court emphasized the principle of statutory interpretation requiring strict construction of statutes which impose criminal liability for violations of administrative regulations. *Id.* Unlike the defendant in *Kraus*, however, PDM knew what activity constituted a violation of Section 666(e) and it had fair warning of the scope of its potential liability.

7. Obviously, employer conduct resulting in injury or death to those not connected to the work site may well result in common law or other statutory liability. But as this court has stated, "It seems clear ... that Congress did not intend [by the Act] to adopt a broad mandatory rule providing that in all cases employee exposure to conditions which are violations of the promulgated standards would result in employer liability." *Anning–Johnson*, 516 F.2d at 1088.

the compromise position of the Sixth Circuit, the district court decided that when a defendant is charged with a misdemeanor and has no right to a grand jury indictment in the first place, any indictment that is handed up may be amended with a superseding information so long as the defendant is not unfairly prejudiced. *See United States v. Pandilidis,* 524 F.2d 644, 648 (6th Cir.1975).[8] Concluding that PDM was not unfairly prejudiced, the district court found nothing preventing the government from proceeding with the information. Reviewing the court's decision de novo, *United States v. Prewitt,* 34 F.3d 436 (7th Cir.1994), we reach the same conclusion.[9]

We first note that the continued authority of PDM's primary case, *Fischetti*— holding that a grand jury indictment may not be amended with an information even prior to trial, 450 F.2d at 39—is in doubt after the Fifth Circuit's decision in *Brewer,* 681 F.2d at 974 (indictment on misdemeanor charge may be amended with superseding information). However, even if *Fischetti* does represent the law of that circuit, we find more convincing the reasoning of the Sixth Circuit in *Pandilidis,* 524 F.2d at 648. A defendant charged with a misdemeanor is generally not entitled to a grand jury indictment. *Duke v. United States,* 301 U.S. 492, 57 S.Ct. 835, 81 L.Ed. 1243 (1937); Fed. R. Crim. Pro. 7(a). When the government nonetheless proceeds with a grand jury, it should be bound by that process unless doing otherwise unfairly prejudices the defendant. *Pandilidis,* 524 F.2d at 644. This is not a constitutional requirement, but one of fairness. *See Brewer,* 681 F.2d at 974. PDM argues that it was unfairly prejudiced by the amendment because it precluded a defense on which PDM could have prevailed—that Thormeyer was not its

employee. However, it was the court's decision on the multi-employer issue, not the information, that removed this defense. Amending an indictment prior to trial so that it conforms with what the government must prove is not inherently unfair. To the extent it removed a defense, it was not a defense to which PDM was entitled. The only other potentially unfair prejudice would be if the information did not give PDM time to prepare for the charge as amended. The district court's finding of no prejudice here is amply supported. PDM knew of the multi-employer issue weeks before trial and even declined the court's invitation for a continuance due to the superseding information. We therefore agree with the district court that the information did not unfairly prejudice PDM's defense, and that proceeding with it was appropriate.

### Vagueness of Regulations

PDM next claims that the OSHA regulations it was charged with violating were unconstitutionally vague, and that the district court's denial of its motion to dismiss based on vagueness should be reversed. The contractor also claims that certain evidentiary rulings and jury instructions amounted to reversible error.

When, as here, a statute or regulation does not implicate the First Amendment rights of a defendant, its vagueness is determined on an "as applied" basis. *Maynard v. Cartwright,* 486 U.S. 356, 361, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); *Village of Hoffman Estates v. Flipside Hoffman Estates,* 455 U.S. 489, 494–95, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982); *United States v. Antzoulatos,* 962 F.2d 720, 726 (7th Cir.1992). To survive a void-for-vagueness challenge, the

---

8. Neither party disputes that PDM was charged with a misdemeanor under 29 U.S.C. § 666(e). See *S.A. Healy v. OSHRC,* 138 F.3d 686 (7th Cir.1998); *United States v. Ladish Malting Co.,* 135 F.3d 484 (7th Cir.1998).

9. The government challenges the district court's conclusion that the superseding information was an amendment, claiming that, after its ruling on the multi-employer doctrine, the information merely squared the indictment with the charge. In addition, the grand jury's finding of probable cause that Thormeyer was PDM's employee nec-

essarily assumed a finding of probable cause that he was a job site employee. Thus, this is not a case where it is impossible to know whether the grand jury would have indicted the defendant for the crime actually proved. See *United States v. McNeese,* 901 F.2d 585, 603 (7th Cir.1990). Because we hold that, absent unfair prejudice, the indictment in this case may be amended with an information, and that PDM suffered no unfair prejudice, we need not address the government's argument.

statute or regulation must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). The void-for-vagueness doctrine is rooted in due process and concerned with "fair and reasonable warning." *Faultless Div. v. Secretary of Labor*, 674 F.2d 1177, 1185 (7th Cir.1982). Central to the doctrine is the requirement that there be minimal guidelines to govern the discretion of those who enforce the statute or regulation in question. *Kolender*, 461 U.S. at 358, 103 S.Ct. 1855. Finally, a regulation will pass constitutional muster even though it could have been drafted with more precision. *Faultless Div.*, 674 F.2d at 1185 (citations omitted); *see also Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (because those who craft statutes are "condemned to the use of words, we can never expect mathematical certainty ...."). Therefore, based on the specific facts of this case, if a reasonable person in PDM's position would have been on notice that its conduct was at risk, and enforceable guidelines exist, the due process concerns are overcome. *See Maynard*, 486 U.S. at 361, 108 S.Ct. 1853.

With this standard in mind we examine each of PDM's vagueness challenges.

### 29 C.F.R. § 1926.751(a), the "Connection Rule"

■ PDM first argues that the "connection rule" is unconstitutionally vague. The regulation states:

> During the final placing of solid web structural members, the load shall not be released from the hoisting line until the members are secured with not less than two bolts, or the equivalent at each connection and drawn up wrench tight.

29 C.F.R. § 1926.751(a). Although it implicitly concedes that the two bolt requirement is sufficiently clear, PDM nonetheless asserts that the "or the equivalent" language makes the regulation unconstitutionally vague because it does not specify how that standard is satisfied. PDM maintained at trial that it had provided equivalent support to the beam which ultimately collapsed and had therefore not violated the statute. Specifically, PDM claimed that although it may have used a single bolt on the failed connection, it was a much stronger bolt than was normally installed by others in the industry during the raising phase. Also, PDM argued that because the beam rested on a seat angle, it had the equivalent vertical support of two bolts. It argues that because the regulation does not give any criteria by which stronger single bolts or seat angles can be judged, it cannot be determined whether a statute's requirements have been met. Thus, concluded PDM, the regulation is void. *In re Metro-East Mfg. Co.*, 655 F.2d 805, 810–11 (7th Cir.1981) (OSHA regulation requiring "reasonable investigative technique" held unconstitutionally vague because it did not specify criteria required for compliance).

■ However, PDM's void-for-vagueness argument fails in this case. The regulation itself provided PDM with a clear, reasonable method of complying: install two bolts wrench tight at each connection. *See Kolender*, 461 U.S. at 357, 103 S.Ct. 1855. This method satisfies due process by giving PDM adequate notice of the required conduct. *Faultless Div.*, 674 F.2d at 1185 ("[A]ll that due process requires is fair and reasonable warning."). By virtue of the unambiguous two bolt language, the regulation is not "so indefinite that men of common intelligence must necessarily guess at its meaning ..." *Allis Chalmers Corp. v. OSHRC*, 542 F.2d 27, 30 (7th Cir.1976) (citing *Ginsberg v. New York*, 390 U.S. 629, 643, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)). The addition of an alternative, less specific means of compliance does not make the regulation unconstitutionally vague. Although the "or the equivalent" language could certainly be clearer, we will not void a regulation for this reason alone. *Faultless Div.*, 674 F.2d at 1185. When PDM chose to rely on the less definite "or the equivalent" language instead of the unambiguous "two bolts" requirement, it did so at its peril.

However, the fundamental weakness in PDM's argument is that it had actual notice

that its connection practice placed it at risk. Prior to the accident, Hyman/Power and Turner/Ozanne communicated to PDM that it was not in compliance with the connection rule. A letter from Hyman/Power indicated that OSHA had confirmed that PDM's practice did not satisfy the regulation. To the extent the "or the equivalent" language is unclear, the actual notice PDM received in this case is certainly "notice sufficient to satisfy due process considerations." *Texas Eastern Products Pipeline v. OSHRC*, 827 F.2d 46, 50 (7th Cir.1987); *Faultless Div.*, 674 F.2d at 1185.

PDM next argues that the vagueness problem was aggravated by the district court's decision not to allow the presentation of certain evidence of "equivalence" to the jury, and by its failure to provide a clearer jury instruction on the connection rule. While PDM fails to show how these arguments are relevant to establishing the connection rule's vagueness, we nonetheless will determine whether any of the court's challenged decisions regarding the connection rule amounted to an abuse of discretion. *United States v. Williams*, 133 F.3d 1048, 1051 (7th Cir. 1998).

Specifically, PDM complains of the trial court's decision not to allow the introduction of the Massachusetts Department of Labor and Industry Bulletin 12 ("Bulletin 12"), from which the connection rule was partially derived.[10] Bulletin 12 allowed one bolt to be substituted for a drift pin during raising[11] and PDM planned to argue that this showed "the equivalent" could mean less than two bolts. The court also barred certain cross examination of by the government's witness, Royall Turpin, about what "the equivalent" meant based on his experience in the construction industry. PDM argues that because both of these decisions deprived the jury of the chance to evaluate whether PDM

had violated the regulation, the court committed reversible error.

▉▉▉▉ The government responds that Bulletin 12 was correctly excluded under Fed. R .Evid. 403 because of its potential to mislead the jury, and that the testimony of Turpin, which called for answers outside the scope of direct examination, was also properly excluded. We agree that neither of these decisions amounts to an abuse of discretion. *See id.* First, Bulletin 12 has little probative value. While it may have been a model for the connection rule, it was not adopted in its entirety. Any reference to a single bolt and drift pin was omitted from what eventually became Section 1926.751(a). The omission at least indicates that this method does not satisfy the connection rule. Yet based on the similar language in both the connection rule and Bulletin 12, the district court could reasonably have concluded that admitting Bulletin 12 would run the risk of confusing or misleading the jury into thinking that a single bolt necessarily satisfied the connection rule. Under these circumstances, the exclusion was not an abuse of discretion. *See United States v. Fawley*, 137 F.3d 458, 466 (7th Cir.1998) (trial judge's determinations under Fed. R. Evid. 403 due "special degree of deference"). Similarly, it was within the court's discretion to sustain objections to certain testimony by Turpin, either because the questions eliciting the testimony went beyond the scope of the direct examination, or because it constituted expert testimony of which the government had not been given proper notice. *See United States v. Prewitt*, 34 F.3d 436, 439 (7th Cir.1994).

▉▉▉▉ PDM also claims that the court erred by not accepting its proposed jury instructions which specified that the government had to prove both that PDM did not use two bolts *and* that it did not provide equivalent support. This, according to PDM, amounted to a breach of the court's duty to

---

**10.** Section 11.3.1 of Bulletin 12 states:

Load Security—During final placing of the solid web structural members the load shall not be released from the hoisting rope until the members are securely fastened in place.

1. Not less than two (2) bolts or equivalent security consisting of one (1) bolt and one (1) drift pin at each end shall be placed in

the connecting holes of the member to secure it in a safe position.

April 1967 Bulletin No. 12. State of Massachusetts, Department of Labor and Industry.

**11.** A drift pin is a temporary connection which slides through the holes of the beam and column but is not secured by a nut.

instruct the jury on every essential element of the offense. *See United States v. Ross*, 77 F.3d 1525, 1540 (7th Cir.1996). PDM claims that under these circumstances the jury was compelled to define criminal behavior—a role not permitted it. *See United States v. Cohen Grocery Co.*, 255 U.S. 81, 87, 41 S.Ct. 298, 65 L.Ed. 516 (1921). We review jury instructions as a whole to determine if they provide "fair and accurate summaries of the law." *United States v. Abdelkoui*, 19 F.3d 1178, 1182 (7th Cir.1994). The trial court is given substantial discretion with respect to the specific wording of the instructions. *Id. In this case the instruction the jury received regarding the connection rule essentially recited the language of the rule itself.*[12] *Because it clearly indicated that two bolts or the equivalent are required to satisfy the regulation, we conclude that this instruction adequately set forth the law. In addition, the trial court rejected PDM's proposed instructions finding each either confusing or argumentative. Having reviewed these instructions, we see no error in the district court's decision.* See United States v. Duff, *76 F.3d 122, 127 (7th Cir.1996) (district court's ruling that defendant failed to propose appropriate instruction reviewed for plain error).*

### 29 C.F.R. § 1926.21(b)(2), the "Training Rule"

■ PDM also argues that the "training rule", the second regulation it was charged with violating, is unenforceable as well as unconstitutionally vague. Again, the contractor claims that its vagueness was aggravated by the trial court's jury instructions. The "training rule" provides:

The employer shall instruct each employee in the recognition and avoidance of unsafe

conditions and the regulations applicable to his work environment to eliminate any hazards or other exposure to illness or injury.

29 C.F.R. § 1926.21(b)(2). PDM claims that the training rule must be read in conjunction with 1926.21(a),[13] which instructs the Secretary of Labor to develop training programs, and 1926.21(b)(1), which requires employers to "avail [themselves] of the ... training programs the Secretary provides."[14] Therefore, PDM reasons, 1926.21(b)(2) merely requires employers to implement the Secretary's programs.[15] According to PDM, the Secretary has never created any programs or guidelines concerning the connection rule, so it cannot be liable for failing to instruct its employees. Otherwise, PDM claims, if the 1926.21(b)(2) is not limited by 1926.21(b)(2), then the training rule does not give sufficient guidance to employers. Because many OSHA provisions could potentially have applied to the post office project, and it would not have been feasible to give instruction on all of them, PDM was forced to guess which were essential to avoid penalty. This, asserts PDM, makes the regulation unconstitutionally vague. *See In re Metro–East Mfg. Co.*, 655 F.2d at 811; *Kropp Forge Co. v. Secretary of Labor*, 657 F.2d 119, 122 (7th Cir.1981).

PDM's argument, however, is not persuasive. The plain language of 1926.21(b)(2) commands an employer to instruct its employees in the recognition of hazards and in any applicable safety regulations. Nowhere in the provision does it refer to the Secretary of Labor—an odd omission if the rule's sole requirement were to fulfill the Secretary's programs. Citing no authority for its interpretation, PDM's argument boils down to

12. The court's jury instruction stated:
   Section 1926.751, what we have referred to as the connection rule, which says: During the final placing of the solid web structural members, the load shall not be released from the hoisting line until the members are secured with not less than two bolts, or the equivalent, at each connection and drawn up wrench tight.

13. *"General Requirements.* The Secretary shall, pursuant to Section 107(f) of the Act, establish and supervise programs for the education and training of employees in the recognition, avoid-

ance and prevention of unsafe conditions in employment covered by the Act." 29 C.F.R. § 1926.21(a).

14. "Employer Responsibility. (1) The employer should avail himself of the safety and health training programs the Secretary provides." 29 C.F.R. § 1926.21(b)(1).

15. *See* 29 C.F.R. § 1926.454 (scaffolds); 1926.503 (fall protection at construction sites); 1926.59 (hazard communications); 1926.62(1) (lead standard); 1926.65 (hazardous waste).

proximity. Yet the mere fact that 1926.21(b)(1) and (b)(2) are next to each other cannot mean that the latter is limited by the former. On the contrary, the two sections imply two separate and independent duties, and the court correctly interpreted them that way. *See Gendron v. United States*, 154 F.3d 672 (7th Cir.1998).

As with the connection rule, we analyze the training rule's vagueness as it applied to PDM on the post office project. *Maynard*, 486 U.S. at 361, 108 S.Ct. 1853. PDM was charged with violating the rule by failing to instruct its employees about the requirements of the connection rule, or of the dangers disregarding it could create. PDM had actual notice of the existence of the connection rule and of its content well before the accident.[16] Its applicability to steel erection was obvious. Under the plain terms of the training rule, PDM was required to bring the connection rule to the attention of its steel workers, particularly those on the raising gang. Contrary to PDM's assertion, the contractor was not forced to guess which of an unlimited number of safety measures required instruction. *See Kropp Forge*, 657 F.2d at 123. Holding PDM liable for failing even to inform its employees of a regulation it was aware of and knew applied to its project, does not offend due process. PDM's vagueness challenge therefore fails. *Faultless Div.*, 674 F.2d at 1185; *Allis Chalmers Corp.*, 542 F.2d at 30.[17]

Finally, PDM maintains that because the instruction given only recited the language of the rule,[18] it did not identify each element of the offense. PDM specifically objects to the fact that the instruction did not

state that training provided by the Ironworkers Union might satisfy this rule. The district court rejected PDM's proposed jury instruction on the grounds that it was confusing and highly argumentative. The court also concluded that PDM's instruction would not be helpful to the jury in understanding the regulation. Having reviewed the proposed instruction, we agree. *Duff*, 76 F.3d at 127.

Because we consider the training rule to be sufficiently clear in this case, reiterating the regulation's language accurately instructed the jury on its requirements. Similarly, the omission of any reference to union training satisfying the rule was not error. PDM has pointed to no authority which supports the proposition that the training rule can be satisfied by simply making payments to the union.[19] Nor has PDM provided evidence that the union actually instructed its raising gang members on the requirements of the connection rule. Under these circumstances, it was well within the court's discretion to deny PDM's proposed instruction. *Id.*

### Evidentiary Rulings

PDM's final set of objections involve various evidentiary decisions the court made during and prior to trial. These decisions, allege PDM, deprived it of the opportunity to mount a full defense. We examine each in turn.

### Evidence of Unrelated Connections

PDM argues that the district court should not have admitted the government's evidence concerning PDM's bolting practices at connections other than the one that failed.[20]

**16.** On March 11, 1993, PDM received a copy of the connection rule attached to Turner/Ozanne's Field Report complaining about PDM's practice of installing a single bolt.

**17.** We note that this is the same conclusion reached by the Eight Circuit in a similar challenge to 29 C.F.R. § 1926.21(b)(2). *National Industrial Constructors v. OSHRC*, 583 F.2d 1048, 1054 (8th Cir.1978).

**18.** The instruction actually given stated:
The other section, which we've called the training rule, reads: The employer shall instruct each employee in the recognition and avoidance of unsafe conditions and the regula-

tions applicable to his work environment to eliminate any hazards or other exposure to illness or injury.

**19.** Neither of the OSHA cases cited by PDM advance this theory. *See Ford Development Corp.*, 15 OSH Cas. (BNA) 2003, 2009 (1992); *Burt Crane, & Rigging, Inc.*, 14 OSH Cas. (BNA) 2045, 2046 (1991).

**20.** The challenged evidence consisted of correspondences among the parties on the job site and testimony by ironworkers indicating that PDM was not installing two bolts at some of the connections.

Because the government was trying to show that it had a propensity to install less than two bolts, says PDM, this evidence was being used to show character and should have been barred by Fed. R. Evid. 404. *United States v. Angelilli*, 660 F.2d 23, 40 (2nd Cir.1981). Moreover, even if the evidence was properly admitted to show willfulness instead of propensity, PDM claims that the court erred in rejecting its instruction which would have limited the jury's consideration of this evidence to willfulness alone.

We disagree with both of PDM's assertions. First, the evidence was clearly relevant to the issue of willfulness. Under the Act, an employer's violation is deemed willful "if done knowingly and purposely by an employer who, having a free will or choice, either intentionally disregards the standard or is plainly indifferent to its requirement." *United States v. Dye Const. Co.*, 510 F.2d 78, 81 (10th Cir.1975). The letters and testimony showing that PDM may have had a practice of installing less than one bolt, and made no effort to determine whether this was sufficient, could show that PDM's conduct was "plainly indifferent" to the requirements of the connection rule. The court determined that the probative value of this direct evidence of willfulness was not outweighed by any potential prejudice. Additionally, the trial court decided that the correspondences and testimony were direct evidence of PDM's failure to comply with the training rule, because not making correct connections at other locations indicated that PDM's workers had not been instructed properly. Thus, the court concluded, limiting the jury to consideration of the evidence only as it related to willfulness was inappropriate. Such a conclusion was well within the court's discretion. *See Prewitt*, 34 F.3d at 439; *United States v. Payne*, 102 F.3d 289, 294 (7th Cir.1996).

### Custom or Practice Evidence

Prior to trial, the district court granted the government's motion in limine to restrict the use of evidence of the custom and practice of steel erection in the construction industry. The court instructed PDM that it could use custom and practice evidence only to show that its connections were "equivalent" to two bolts wrench tight. Because much of PDM's evidence did not go to that question, it was not admitted. PDM now claims that the exclusion was improper, entitling it to a new trial. According to the contractor, the court's decision amounted to a blanket exclusion of custom and practice evidence which is contrary to decisions by other courts and by OSHA itself. *See Cape & Vineyard Div. v. OSHRC*, 512 F.2d 1148, 1152 (1st Cir.1975); *American Bridge Co.*, 17 OSH Cas. (BNA) 1169 (1995). While a total exclusion of custom and practice evidence irrespective of its purpose may well have been inappropriate, that is not what happened here. This court has previously held that such evidence may not be presented to suggest that employers may "avoid compliance with specific safety mandates by relying on the (perhaps equally objectionable) practices of their peers." *Faultless Div.*, 674 F.2d at 1186–87. To the extent the district court excluded evidence based on a fear that the jury might find PDM not guilty because "everyone does it," its decision was correct. *Id.* Because PDM has failed to show that any of the excluded custom and practice evidence was specifically linked to its argument about equivalence, it has not demonstrated any error by the district court.

### OSHA Citation and Civil Complaint

Prior to trial, the district court ruled that the original OSHA citation and civil complaint against PDM issued in May 1994 would not be admitted into evidence because the information it contained was of little relevance and posed a significant threat of confusion and delay. PDM argues that because the OSHA citation categorized its violation as "serious", it necessarily found that it was not "willful." *See United States v. Ladish Malting Co.*, 135 F.3d 484, 488–90 (7th Cir.1998). This, PDM claims, made it highly relevant to the issue of whether, in the judgment of OSHA, PDM had willfully violated any safety regulations. The government responds that because the citation and complaint did not directly state that PDM had not willfully violated the regulations, it was not relevant. The citation and complaint, argues the gov-

ernment, reflected the Department of Labor's opinion of the strength of the evidence against PDM over two years before it was charged with violating 666(e). The Department of Labor's opinion at that point, the government maintains, was not an issue in this case.

Although the evidence may have some probative value, we agree with the government that any value would have been limited. At most, it suggests that six months after the accident, and before much of the evidence was collected, the Department of Labor concluded that it only had evidence sufficient to establish a "serious" violation. *Cf. United States v. Delgado*, 903 F.2d 1495, 1499 (11th Cir.1990) ("The government's decision not to prosecute a defendant on certain charges reflects, at best, the government's opinion that the defendant is not guilty of them."). The district court weighed the probative value of that inference against the potential for jury confusion and delay. As the court explained, if the citation were admitted, the court would be required to let the government "present evidence explaining the OSHA investigation process, the state of OSHA's evidence six months after the accident, and the difference between an OSHA investigation and a criminal prosecution." (Memorandum Opinion and Order p. 3, July 28, 1997). Because we believe that such a mini-trial on the OSHA citation could distract and confuse the jury from the main issues in the case, and that the probative value of the evidence is limited, we conclude that the court did not abuse its discretion in excluding it under Fed. R. Evid. 403. *See White v. United States*, 148 F.3d 787, 791 (7th Cir.1998) (fear of mini-trial supports court's decision to exclude disputed evidence of doctor's credentials).

### Evidence of Seat Angle Design

Finally, PDM claims that the court should have admitted its proposed evidence showing that the seat angles used to make the connections at issue were defectively designed. PDM claims that this evidence went directly to the issues of compliance with the connection rule, causation and willfulness. While the court agreed that PDM could pres-

ent design defect evidence to show compliance with the connection rule's equivalency requirement, it found that PDM had failed to show how its proposed evidence advanced that argument. Similarly, on the issue of causation, the court reasoned that because PDM did not allege that it had evidence showing that the accident would have happened regardless of any willful violation of the connection rule, it was not relevant to the question of cause in fact. Also, the proposed evidence said nothing about the foreseeability of the workers' deaths, so it was not relevant to proximate or legal causation. While PDM asserts that this was error, it does not refute the district court's reasoning. Instead, it emphasizes that the evidence should have been admitted to show willfulness. PDM argues that because it felt the seat angle was sufficient to support the beam at issue, its violation was not willful. The district court failed to see how evidence of the faulty design of the seat angles supported the notion that PDM's violation of the connection rule was not willful. *See Ladish Malting*, 135 F.3d at 491 (no good faith defense to willfulness under Section 666(e)). Under these circumstances the court decided to keep this highly technical, confusing and distracting evidence out. We conclude that the decision was well within the court's discretion. *United States v. Fawley*, 137 F.3d 458, 466 (7th Cir.1998).

### Conclusion

For the foregoing reasons, the judgment of the district court is AFFIRMED.